

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ROBERT N. GOLDSTEIN,** | § | |
| **GOLDSTEIN/HABEEB** | § | |
| **ENTERTAINMENT, INC., and** | § | |
| **CHEATERS, LTD.,** | § | |
|     Plaintiffs | § | **CAUSE NO. 3-04-CV-677-P** |
| | § | |
| **vs.** | § | |
| | § | |
| **TOMMY HABEEB,** | § | |
|     Defendant. | § | |

CLERK, U.S. DISTRICT COURT
JUN - 3 2004
By _____
Deputy

**DEFENDANT'S APPENDIX TO BRIEF IN SUPPORT OF RESPONSE AND CROSS**
**MOTION FOR SUMMARY JUDGMENT**

**TAB "A"**                **AFFIDAVIT OF ANDREW A. BERGMAN**

    **Exhibit "1"**         **HABEEB'S FIRST AMENDED PETITION IN THE STATE**
                                      **ACTION**

    **Exhibit "2"**         **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IN**
                                        **THE STATE ACTION**

Ex.
A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ROBERT N. GOLDSTEIN, | § | |
| GOLDSTEIN/HABEEB | § | |
| ENTERTAINMENT, INC., and | § | |
| CHEATERS, LTD., | § | |
| Plaintiffs | § | CAUSE NO. 3-04-CV-677-P |
| | § | |
| vs. | § | |
| | § | |
| TOMMY HABEEB, | § | |
| Defendant. | § | |

## AFFIDAVIT OF ANDREW A. BERGMAN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Andrew A.

Bergman, who, known to me, and, after being duly sworn, upon his oath deposed and stated as

follows:

"1.  My name is Andrew A. Bergman. I am over the age of eighteen (18) years, have never been convicted of a felony or crime involving moral turpitude, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated herein, which I swear are all true and correct.

2.  I am licensed to practice law in the State of Texas and have been doing so primarily in Dallas County and its surrounding counties for over eighteen (18) years. I am counsel of record for Defendant in this case, as well as the case styled Tommy Habeeb, as a shareholder of Goldstein/Habeeb/McCalmont Entertainment, Inc. v. Robert N. Goldstein, Timothy Sorenson, Goldstein/Habeeb/McCalmont Entertainment, Inc. and Cheaters, Ltd., Case. No. DV-03-13229-L currently pending in the 193rd District Court of Dallas County, Texas (the "State Action").

3.  Attached hereto as Exhibit "1" is a true and correct copy of the First Amended Original Petition I filed in the State Action. Such State Action is a shareholder derivative case.

4.  Attached hereto as Exhibit "2" is a true and correct copy of the Motion For Summary



Judgment filed by the defendants in the State Action (the Plaintiffs herein). Defendants' motion was heard on May 17, 2004 in the 193rd Judicial District Court. Judge David Evans denied the Motion.

FURTHER AFFIANT SAYETH NOT."

Andrew A. Bergman

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the 3rd

day of June, 2004, to certify with my hand and seal of office.

Notary Public in and for the State of Texas

My Commission Expires:

RUBY ROMAN
MY COMMISSION EXPIRES
June 24, 2006

Printed Name of Notary Public

Exh.
1.

## CAUSE NO. DV-03-13229-L

| | | |
|---|---|---|
| TOMMY HABEEB, as a | § | IN THE DISTRICT COURT |
| shareholder of Goldstein/Habeeb/McCalmont | § | |
| Entertainment, Inc. | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| vs. | § | 193rd JUDICIAL DISTRICT |
| | § | |
| GOLDSTEIN/HABEEB/MCCALMONT | § | |
| ENTERTAINMENT, INC., | § | |
| CHEATERS, LTD., | § | |
| ROBERT N. GOLDSTEIN, and | § | |
| TIMOTHY SORENSON. | § | |
| | § | |
| · **Defendants.** | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Tommy Habeeb, "Habeeb", as a shareholder of Goldstein/Habeeb/McCalmont Entertainment. Inc., Plaintiff. complaining of Robert N. Goldstein, Timothy Sorenson, and Cheaters, Ltd., and joining Goldstein/Habeeb/McCalmont Entertainment. Inc. as a party defendant. and in support thereof would respectfully show the Court as follows:

### I.

### DISCOVERY LEVEL

Plaintiff intends to conduct discovery in this case under Level 2 of Rule 190 (Rule 190.3) of the Texas Rules of Civil Procedure.

## II.

## THE PARTIES

1.     Defendant Robert N. Goldstein ("Goldstein" or "Defendant Goldstein"), is an individual who may be served with process at his place of business at 1350 Manufacturing St., Suite 120, Dallas, Texas 75207, or any other place where Defendant Goldstein may be found.

2.     Defendant Goldstein/Habeeb/McCalmont Entertainment, Inc. ("GHM") is a corporation licensed to do business in the State of Texas.  Defendant Goldstein/ Habeeb/McCalmont Entertainment, Inc. may be served with process through its agent for service of process, Bobby Goldstein, who is located at 4516 Lovers Lane #104, Dallas, Texas 75225.

3.     Defendant Timothy W. Sorenson ("Sorenson" or "Defendant Sorenson") is an individual who may be served with process at his place of business, 1717 Main Street, Suite 5500, Dallas, Texas 75201, or any other place where Defendant Sorenson may be found.

4.     Defendant Cheaters, Ltd. is a limited partnership licensed to do business in the State of Texas.  Defendant Cheaters, Ltd. may be served with process through its agent for service of process, Robert N. Goldstein, who is located at 8603 Preston Road, Dallas, Texas 75225.

## III.

## SHAREHOLDER STATUS

5. Habeeb, at the time of the acts or omissions made the basis of this proceeding, was a record owner of shares in GHM. Habeeb fairly and adequately represents the interests of GHM and the interests of other shareholders similarly situated in enforcing the rights of GHM.

## IV.

## NO DEMAND ON CORPORATION REQUIRED

6. GHM is a closely held corporation as defined by Article 5.14 (L)(2) of the Texas Business Corporation Act. Defendant Goldstein is the majority shareholder in GHM, as well as the President and Chairman of the Board of the corporation. As set forth below, Goldstein has managed the company without regards to any corporate formalities. As a result of these factors, it would be futile to attempt to have suit brought by the Board of Directors of GHM.

## V.

## FACTUAL BACKGROUND

7. Tommy Habeeb is an experienced actor and producer in the entertainment industry. In or around the early part of 1998, Tommy Habeeb was introduced to Defendant Goldstein in a social setting. At the time, Tommy Habeeb was told that Goldstein was an attorney who was interested in getting into the entertainment business. Goldstein told Habeeb that he had an idea for a television show and, because of Habeeb's experience in the television industry, would like to meet more formally with him to

3

discuss his idea. Habeeb and Goldstein followed up and had a more formal meeting and discussion about Goldstein's idea.

8. At this subsequent meeting, Goldstein presented Habeeb with a rough and undeveloped concept for a television show. The theme of Goldstein's concept was a reality based show in which persons having extramarital or extra relationship sexual liaisons would be "caught", confronted and exposed on the show. Because of Habeeb's experience in the industry, including the fact that Habeeb had experience in developing, producing and hosting television shows, as well as Goldstein's lack of experience in the industry, Goldstein requested that Habeeb assist in the development of the show as well as other potential entertainment related matters. Habeeb agreed to go into business with Goldstein.

9. Unbeknownst to Habeeb at the time, Goldstein had a reputation in the legal community of being unscrupulous, unethical, and dishonest. In fact, at the beginning of this newly formed relationship between Habeeb and Goldstein, Goldstein was a defendant in a mega-million dollar legal malpractice claim arising out of Goldstein's receiving a multi-million dollar contingent fee in a highly publicized divorce involving the wife of Scott Ginsberg, a local media mogul. This malpractice case ultimately resulted in a judgment against Mr. Goldstein in an amount in excess of $100,000,000. Mr. Goldstein's unethical conduct as a lawyer ultimately led to his disbarment.

10. Mr. Goldstein's legal troubles and his unscrupulous reputation were not known by, nor revealed to, Habeeb prior to the time that Habeeb and Goldstein formalized their business relationship. Goldstein represented to Habeeb that as a lawyer,

Goldstein could handle the multitude of legal aspects involved in the venture. Unfortunately, what Habeeb did not know at the time was that Goldstein would use his legal knowledge to defraud Plaintiff at every turn.

11.    On or about April 20, 1998, in furtherance of what was discussed in their initial meeting, Goldstein and Habeeb entered into a Consulting Agreement (the "Consulting Agreement"), whereby Goldstein agreed to pay Habeeb for his consulting expertise to develop the television concept ultimately called "Cheaters".

12.    On or about August 10, 1998, Habeeb and Goldstein formed a corporation named Goldstein/Habeeb Entertainment, Inc. ("GHE"). Habeeb and Goldstein were equal shareholders. On the same day, Goldstein, Habeeb and GHE entered into a Shareholders' Agreement (the "First Shareholders' Agreement"). Pursuant to the terms of the First Shareholders' Agreement, among other terms, Habeeb was to serve as the host of Cheaters.

13.    Also on the same day, August 10, 1998, Goldstein and GHE, the newly-formed corporation which would develop the show and own the show, entered into an Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") whereby Goldstein assigned his rights in the Consulting Agreement between Goldstein and Habeeb to GHE. The result of this transaction was that now the Consulting Agreement was between GHE and Habeeb.

14.    Finally, to complete the formalities of this venture, Goldstein and GHE entered into a License Agreement (the "License Agreement") whereby Goldstein granted GHE the exclusive right to use, develop and market any and all trademark and/or intellectual property rights owned by Goldstein in the "Cheaters" project.

5

15.    The net result of these August 10, 1998 documents was that Goldstein and Habeeb, through their stock ownership in GHE, were equal owners of the Cheaters project. Habeeb's responsibilities would include the assistance in developing the project into a television program that would be nationally and internationally broadcast with Habeeb also being the "host" of the show. Pursuant to the License Agreement, GHE had until August 10, 2000 to cause the show to be broadcast on cable television. Pursuant to the License Agreement, if the project did not result into a broadcasted television program within two years of the date of the License Agreement, the License would terminate. As was the case with many of the documents entered into, Goldstein himself executed the documents on behalf of himself and on behalf of GHE.

16.    As the formal documents were being drafted, as well as subsequent thereto, Habeeb began to devote his time, talent, resources and energy into turning the rough concept into a broadcasted television show.

17.    On or about August 25, 1999, but for reasons unknown by Habeeb, expressly effective June 1, 1999, Habeeb, Goldstein and GHE entered into a new Shareholders' Agreement (the "Second Shareholders' Agreement"). The stated purpose of entering into this new Shareholders' Agreement was to reflect a change of ownership structure in GHE from 50-50 to 70-30 in favor of Goldstein. As set forth more fully below, Goldstein was able to cause Habeeb to acquiesce to this arrangement by threatening to cut off financing and terminate the License Agreement thereby preventing Habeeb from receiving any financial rewards from the project.

18.    The Second Shareholders' Agreement contained also the affirmative covenant that Habeeb would host the show and also contained a provision that Habeeb

would receive a salary equal to that of Goldstein. The Second Shareholders' Agreement, as in the original, also prohibited certain related party transactions without proper approval.

19.     While Habeeb was developing the project, Goldstein was fighting his personal legal and professional problems. When Goldstein was not immersed in such outside issues, he came up with another legal structural change to the project. Deciding that he and/or the project needed more money, Goldstein decided to raise money by selling limited partnership interests. Accordingly, in a series of legal maneuvers, Goldstein formed a limited partnership called Cheaters, Ltd. This occurred on or around August 25, 1999. Pursuant to this structure, GHE would be the General Partner and investors would be limited partners.

20.     Meanwhile, after some months of negotiating with production companies, GHE entered into a contract with Keller Syndication to syndicate "Cheaters". Thirteen shows were purchased for broadcast in the spring of 2000 in Germany. Goldstein received the money from the Germany sale, yet failed to apprise Habeeb as to the amount paid for the 13 shows despite the repeated insistence of Habeeb that Goldstein reveal this information. Later, in an attempt to placate Habeeb, Goldstein falsely informed Habeeb of amounts received from the syndicator. Later that year Keller Syndication entered into a contract by which a company named Western International Syndication would secure syndication in the United States for the show Cheaters.

21.     As Habeeb continued to work on the show for Germany, Goldstein claimed to be short on funds for production. Goldstein secretly began to commingle and divert the accounts of GHE with those of his law practice and Goldstein's personal

accounts and other entities he controlled. Habeeb continued to inquire about the financial situation of GHE but Goldstein rebuked Habeeb at every turn.

22.    Around this same time, Goldstein formed the limited partnership, Cheaters, Ltd., ostensibly to raise funds for the project. As the date for the deadlines for airing the show in Germany approached, and financial potential appeared likely, Goldstein presented Habeeb with the Second Shareholders' Agreement and demanded that Habeeb sign it. Goldstein threatened to shut down the entire project and terminate all funding for Cheaters if Habeeb did not yield to his demands that Goldstein own ninety percent (90%) of the stock in GHE. Habeeb at first refused to give in to Goldstein's demands but ultimately signed the Second Shareholders' Agreement, which increased Goldstein's ownership share to seventy percent (70%) and decreased Habeeb's ownership to thirty percent (30%).

23    As outside investors came forward, and as money was being raised through Goldstein's sale of limited partnership interests, Goldstein diverted the funds to himself personally and to the various other entities he had secretly formed. This left GHE with heavy financial problems. Goldstein began to bounce checks, and move monies from the accounts of GHE into his personal accounts and the accounts of his law practice to avoid financial responsibilities to Habeeb, employees of GHE, and to creditors alike. Goldstein even boasted that he kept two different sets of books for GHE.

24    Despite all of the above, the thirteen shows were produced and delivered for airing in Germany. Payment for the shows exceeded $400,000.00. Without the consent of Habeeb, Goldstein allocated the money at his discretion, apparently giving himself a large portion, and the outside investors a small portion of the monies received.

Goldstein paid the investors to entice them to invest more money in the project, promising them great returns in exchange.

25.    In or around the fall of 2000, Cheaters was set to air in the United States, and GHE had to produce eleven episodes under its agreement with Western International Syndication. While Goldstein had looted GHE, he claimed that GHE did not have the funds for production. At this same time that Goldstein was claiming poverty of himself and GHE he was making lavish purchases for himself and his mistress, Cara, whom Goldstein employed at GHE. Such purchases included cars and a luxurious high-rise condominium.

26.    Once production began for the eleven shows for syndication in the United States, it became apparent to both Goldstein and Habeeb that more production staff was necessary. John McCalmont (hereinafter sometimes referred to as "McCalmont") was hired, and the name of GHE was changed to Goldstein/Habeeb/McCalmont Entertainment, Inc. ("GHM") McCalmont was given ten percent (10%) of the stock in the corporation and Habeeb's ownership was even further diluted. Around this time Goldstein stepped up his efforts to push Habeeb out of the company.

27.    · On or about October 27, 2000, Habeeb, Goldstein, McCalmont, and GHM executed another Shareholders' Agreement (the "GHM Shareholders Agreement"). The GHM Shareholders Agreement provided, among other things, that Goldstein, McCalmont, and Habeeb were to be on the Board of Directors of GHM, and that Goldstein was to serve as President and Secretary.

28.    Once Cheaters began to air across the United States, it caught on quickly and soon began to air on almost every market in the United States. As the show was a

success, advertising revenues would have been increasing.   Goldstein concealed the amount of advertising revenues, despite Habeeb's demands for documentation reflecting the financial conditions and revenues of GHM.  Goldstein steadfastly refused to devulge this information, claiming that no revenues were being generated, all the while spending and diverting the money for his own benefit and at his own discretion, while failing to pay some employees and creditors.

29.     As the success of Cheaters continued to increase, Habeeb approached Goldstein with an idea to turn Cheaters into a series which could be purchased on video tape by consumers.  Based on Habeeb's advice, Goldstein negotiated a deal for the video tapes which yielded a large cash advance. Once again Goldstein refused to divulge the particulars of the deal including treatment of the cash advance received and how the money was being utilized.  Goldstein, however, continued to live lavishly and failed to pay some creditors and employees of GHE and GHM.

30.     On or about November 28, 2001, Goldstein sent Habeeb an email, in which Goldstein purported to revoke the License Agreement to GHM. The purported revocation was not based on any of the authorized events of revocation or termination under the License Agreement.

31.     Goldstein's behavior was tempered upon learning shortly thereafter that several television accounts had threatened to drop the show if Habeeb was not allowed to remain as host of Cheaters.  By this time, Habeeb was a popular television celebrity and was receiving tremendous amounts of fan mail.  Habeeb was also making appearances for the show including TV appearances on the Maury Povich Show. Goldstein contacted Plaintiff days later and attempted to convince Habeeb to remain the host, yet still

relinquish Habeeb's shareholder rights to Goldstein, which Plaintiff steadfastly refused to do. However, Habeeb agreed to continue to host Cheaters for $2,500.00 per episode. Habeeb refused to relinquish any ownership rights.

32.     Habeeb was the host of Cheaters through the second season of the show, and filming for the third season was beginning. The successful production of a third season was critical in the potential realization of huge financial rewards for second run syndication. At this time Goldstein set out once again to coerce Habeeb into giving up his shareholder interest.

33.     As set forth above, the third production season of Cheaters brought great potential financial reward because of the viability of second run syndication, the big money payoff for television shows. Second run syndication occurs where a television company assumes the rights to a group of shows that have already aired and then distributes the shows to various markets, both domestic and foreign. One hundred (100) produced and aired shows is a critical point for purposes of second run syndication. Goldstein is currently attempting to reach and/or has succeeded in reaching lucrative second run syndication deals.

34.     .From the onset of the project, Habeeb designed Cheaters, a one-hour show, to have two distinct thirty-minute episodes. The purpose of having two distinct thirty-minute episodes was to shorten the time period to create the one hundred (100) episodes generally needed for viable second run syndication. These one hundred (100) episodes would be accomplished in the third season of Cheaters.

35.     Goldstein was well aware of the potential financial reward of second run syndication and with Cheaters entering its third season, knew that the realization of that

potential was close at hand.  In fact, Habeeb noticed a draft of a contract on Goldstein's desk which Habeeb believes was for second run domestic distribution rights.  When confronted, Goldstein once again denied Habeeb any and all financial information.

36.     Habeeb had not been paid his hosting fees for the second season. Going into the third season, Goldstein presented Habeeb with a Hosting Agreement. The Hosting Agreement provided that Habeeb was to be paid his hosting fee on the 15th of each month. The Agreement further provided that if payment was not made within thirty days of its due date, the agreement would be void. Failure to make such payments would prohibit the use of Habeeb's likeness on the show.

37.     During the course of the third season, Goldstein "fired" Habeeb as host. After being "fired", Habeeb was hired by a national phone company, "Phones For All", as their commercial spokesman. Goldstein threatened the President of Phones For All that if they used Habeeb, Goldstein would sue them. Goldstein then attempted to get Phones For All to hire the new host of Cheaters, Joey Greco, as commercial spokesman. Goldstein's interference resulted in the loss of job opportunities for Habeeb.

38.     Of all of the outrageous and illegal actions taken by Goldstein as set forth above, the next, described below, was amazingly outrageous even by Goldstein's standards. Knowing that Habeeb still had a substantial financial interest in Cheaters by virtue of Plaintiff's stock ownership in GHE and/or GHM, the General Partner of Cheaters, Ltd. and the rightful owner of the license. Goldstein became determined to compromise all of GHM's rights in the show. Without any legal authority or justification Goldstein attempted to oust GHM as the General Partner of Cheaters, Ltd. and in its place, make himself and/or one of his entities the General Partner.  The attempted ouster

of GHM as General Partner was not authorized by the Limited Partnership Agreement of Cheaters, Ltd., nor were the limited partners notified of the purported change.

39.     After unlawfully attempting to oust GHM as the General Partner of Cheaters, Ltd., and placing himself in that position, Goldstein entered into another licensing agreement for the Cheaters project. This time, Goldstein licensed the rights directly to the partnership itself under new terms and conditions.

40.     If this was not enough, Goldstein, with the lawyering assistance of Defendant Sorenson, fraudulently tried to document and cloak these transactions with some sort of legitimacy. While the purported change of the General Partner occurred in November, 2001, by letter dated February 13, 2003, Defendant Sorenson requested the limited partners' approval of the actions taken by Goldstein. This action occurred after GHE, Goldstein, and Cheaters, Ltd., with Sorenson as counsel for all, filed suit in federal court against Habeeb for alleged trademark infringement.

41.     Sorenson's letter intentionally misrepresented both the factual events that had transpired and the legal effect of what was being sought by the letter. Sorenson falsely claimed that GHM had "invested no moneys to the development" of the Cheaters program. Sorenson then states that because of this alleged fact, as well as the alleged insolvency of GHM, that Goldstein revoked the License Agreement (effective November 2001) to GHM. Sorenson informed the limited partners that GHM's assignment of its license rights to the Partnership was null and void. Mr. Sorenson then stated in his letter requesting approval of Goldstein's actions that the alleged financial insolvency of the corporate general partner (i.e. GHM) "could subject the Limited Partnership to double taxation" and that is why Goldstein took on the role as General Partner.

42.     Sorenson's letter, after using false and misleading statements of fact and law to scare the limited partners, sought the limited partners' execution of an amendment to the Limited Partnership Agreement which, according to Sorenson's letter, would essentially validate these actions.   Sorenson also references the federal litigation (in which he has the conflicting interests of representing GHM and Goldstein) and cites the litigation as a reason for hastening their responses and approval.   Sorenson suggests communications concerning his letter come to him or Goldstein and not Habeeb.

43.     Interestingly, Sorenson's letter neglects to tell the limited partners that he, Sorenson, is the lawyer who purports to represent Goldstein, Cheaters, Ltd. and GHM in the federal litigation. His letter also fails to reveal his obvious conflicts of interest in representing his three clients that have obviously differing interests.

## COUNT ONE: PLAINTIFF'S CLAIMS AGAINST GOLDSTEIN FOR BREACH OF LICENSE AGREEMENT

44.     Plaintiff hereby incorporates by reference the factual allegations contained in the preceding paragraphs as if set forth verbatim.

45.     On or about August 10, 1998 Goldstein and GHM entered into the License Agreement pursuant to which Goldstein granted GHM an exclusive license to use, develop and market any and all intellectual property rights owned by Goldstein related to the Cheaters project.   The initial term of the license was to end on December 31, 2004 and then automatically renew every year unless terminated in accordance with the terms set forth in the License Agreement.

46.    On November 28, 2001 Goldstein sent an email to Habeeb stating that "effective immediately and retroactively" the License Agreement was terminated. Goldstein's termination email did not specify any basis for the termination much less a basis that comports with the termination provisions in the License Agreement. Of course, the reason that Goldstein did not specify a basis for the termination was because no basis existed for termination of the License Agreement.

47.    Goldstein's actions in attempting to terminate the License Agreement constitute breach and repudiation of the License Agreement. After his repudiation, Goldstein attempted to license the intellectual property rights of Cheaters directly to Cheaters, Ltd. by entering into another licensing agreement licensing the same property.

48.    As a result of Goldstein's repudiation of the License Agreement, GHM has been damaged in an amount greatly in excess of the minimum jurisdictional limits of this Court, for which it now sues. Additionally, GHM seeks recovery of its reasonable attorneys' fees.

### COUNT TWO: PLAINTIFF'S BREACH OF
### FIDUCIARY DUTY CLAIMS AGAINST GOLDSTEIN

49.    Plaintiff hereby incorporates by reference the factual allegations contained in the preceding paragraphs as if set forth verbatim.

50.    Goldstein was, and presumably still is, the president and a director of GHM. As a director, Goldstein stood and stands in a fiduciary relationship to GHM, and the shareholders of GHM. Goldstein negligently, recklessly, or intentionally breached these duties by, among other things:

a.   systematically looting the assets of GHM for his own personal benefit;

b.   diverting money and property of GHM for his own personal benefit;

c.   failing to make full disclosure of the financial affairs of the corporation;

d.   usurping business opportunities for himself and his other entities which rightfully belong to GHM;

e.   engaging in corrupt business practices such as taking money for himself instead of using such money for production and/or to pay employees and creditors;

f.   willfully interfering with the contracts of GHM in order to personally reap the benefits of such contracts;

g.   acting in his own interests in making decisions for GHM instead of acting in GHM's interests;

h.   avoiding the governance structure of the corporation by acting unilaterally instead of presenting appropriate matters for decision by the Board of Directors;

i.   attempting to oust GHM as the general partner of Cheaters, Ltd. and placing himself in that position;

16

j.     engaging and instructing legal counsel to institute litigation that is not in the best interests of the corporation but rather serves his own personal interests;

k.     engaging and instructing legal counsel to mislead and intimidate the limited partners of Cheaters, Ltd. into approving unlawful actions taken by Goldstein to oust GHM as general partner and substitute himself as general partner;

l.     firing Habeeb as host of the Cheaters program in contravention of the First and Second Shareholder Agreements as well as Plaintiff's public popularity for the purpose of obtaining more personal benefit for himself;

m.    using corporate funds for personal purchases for himself and his mistress;

n.     allocating the investments of outside investors in GHM and Cheaters, Ltd. into Goldstein's personal accounts; and

o.     using the monies of GHM to pay salaries to employees who did not work for GHM but in fact worked for Goldstein personally.

51.    These acts and omissions, among others, were taken in bad faith and were contrary to the best interests of GHE, GHM, and the Shareholders of such corporations, and therefore constitute breaches of fiduciary duties that proximately caused very substantial damages to Plaintiff, for which it now sues.

## COUNT THREE: PLAINTIFF'S CLAIMS FOR CONVERSION AGAINST GOLDSTEIN

52.    Plaintiff hereby incorporates by reference the factual allegations contained in the preceding paragraphs as if set forth verbatim.  Plaintiff hereby asserts causes of action based on conversion.

53.    Goldstein and his entities have assumed dominion and control over funds rightfully belonging to Plaintiff.  Despite demand for such sums, Goldstein and Goldstein Investments, Cheaters International, Bobby Goldstein Productions, Inc., and Cheaters Detective Agency, Inc. (the "Goldstein Entities") have failed and refused and have continued to fail and refuse to return such monies.  Because of Goldstein's deception, the total amount of money converted by him and the Goldstein Entities is not known at this time.

54.    Plaintiff would also show that Goldstein and the Goldstein Entities have also assumed dominion and control over tangible intellectual property, including the visual film recordings of the Cheaters episodes, which rightfully belong to Plaintiff.  The fair market value of such property at the time of the conversion is estimated to be in excess of $10,000,000.00, for which Plaintiff now sues.

55.    Plaintiff also seeks an award of exemplary damages.

## COUNT FOUR: PLAINTIFF'S CLAIMS FOR NEGLIGENCE AND BREACH OF FIDUCIARY DUTY AGAINST SORENSON

56.    Plaintiff hereby incorporates by reference the factual allegations contained in the preceding paragraphs as if set forth verbatim.

57.     Defendant Sorenson is an attorney licensed in the State of Texas and is counsel of record for Goldstein, GHE and Cheaters, Ltd. in the federal litigation. In November, 2001, Goldstein, even though he was the president and a director of GHM, purported to revoke the License Agreement between himself and GHM. At the same time Goldstein attempted to revoke the License Agreement, he also attempted and purported to replace GHM with himself as the General Partner of Cheaters, Ltd.

58.     In a letter dated February 13, 2003, more than fourteen months **after** Goldstein attempted these actions without notice to Cheaters, Ltd. or the individual limited partners thereof, Defendant Sorenson, on behalf of Goldstein, sought the approval of such actions and an amendment to the Limited Partnership Agreement. The attempted effect of these actions would cause GHM to have no rights to Cheaters going forward, and thereby cause GHM tremendous financial harm. At the time that Sorenson took action to aid and abet Goldstein, and to hurt Plaintiff, he was already counsel for Plaintiff in the federal court case. As an attorney for GHM, Sorenson owed it a fiduciary duty. Sorenson breached his fiduciary duty by taking actions that were clearly contrary to his client's best interests. In fact, the intended effect of Sorenson's actions would be deleterious to GHM.

59.     Plaintiff would also show that Defendant Sorenson breached and continues to breach his fiduciary duties to Plaintiff GHM by virtue of his dual representation of Goldstein and GHM. The personal interests and desires of Goldstein are in complete conflict and competition to those of GHM. Goldstein's actions were and are, by attempting to revoke the License Agreement and to oust Plaintiff GHM as General Partner of Cheaters, in complete conflict with the interests of GHM. The



interests of GHM with respect to the License Agreement are diametrically in opposition to Goldstein's interests. Clearly Sorenson is furthering Goldstein's interests to the detriment of GHM.

60.     By representing Goldstein and Plaintiff GHM, Defendant Sorenson has breached his fiduciary duty to Plaintiff GHM to its substantial detriment. Accordingly, Plaintiff hereby sues for an amount greatly in excess of the jurisdictional limits of this Court. In addition, Plaintiff GHM seeks forfeiture of any fees paid to Defendant Sorenson. Defendant Sorenson's actions are of such nature and character that the law allows for the imposition of exemplary damages for which Plaintiff GHM now also sues.

61.     Plaintiff would further show that the actions of Sorenson constitute negligence. As attorney for Plaintiff GHM, Sorenson owed his client the duty to use reasonable care. Sorenson breached this duty by, among other things;

           a.     Assisting Goldstein in attempting to effectuate the removal of GHM as General Partner of Cheaters, Ltd.;

           b.     Representing Goldstein in litigation in which the interests of GHM could be dramatically negatively affected; and

           c.     Assisting Goldstein in his attempt to wrongfully revoke the License Agreement.

62.     At the time Sorenson committed each of the foregoing acts it was reasonably foreseeable that such acts would result in an unreasonable risk of harm to GHM. Sorenson's actions have proximately caused severe financial damages to GHM for which Plaintiff now sues.

## COUNT FIVE: PLAINTIFF'S CAUSE OF ACTION FOR AN ACCOUNTING OF GOLDSTEIN, GHM, AND CHEATERS, LTD. AND APPOINTMENT OF A RECEIVER

63. Plaintiff hereby incorporates by reference the factual allegations contained in the preceding paragraphs as if set forth verbatim. As set forth above, Goldstein has usurped the funds, assets, accounts, revenues, and streams of revenue of GHM and Cheaters, Ltd. Accordingly, an investigation of the accounts of Goldstein, GHM, and Cheaters, Ltd. is necessary to determine what property, rights and revenues rightfully belong to GHM. If such be necessary, Plaintiff respectfully requests that a third party having expertise in these matters be appointed as a receiver to appropriately conduct such accounting and oversee the business affairs of Goldstein, GHM, and Cheaters, Ltd. to prevent further misappropriation of funds and or removal of the property rightfully belonging to GHM.

## EXEMPLARY DAMAGES

64. Plaintiff hereby incorporates by reference the factual allegations contained in the preceding paragraphs as if set forth verbatim. The actions of Defendants are of the kind of conduct for which the law allows the imposition of exemplary damages in that Defendants acted with malice, as that term is defined by Texas Civil Practice and Remedies Code §41.001(7). The acts or omissions of Defendants when viewed objectively from their standpoint at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff, and Defendants were actually, subjectively aware of the risk involved, and nevertheless proceeded with conscience indifference to the rights of Plaintiff. Plaintiff



therefore seeks exemplary damages in an amount that greatly exceeds the minimum jurisdictional limits of this Court to be determined by the trier of fact herein.

## COUNT SIX: PLAINTIFF'S CLAIMS FOR CORPORATE WASTE AGAINST GOLDSTEIN

65.     Plaintiff hereby incorporates by reference the factual allegations contained in the preceding paragraphs as if set forth verbatim.  Goldstein, as the President and a Director of GHM, had a duty to refrain from wasting the assets of GHM.  Goldstein has nevertheless engaged in transactions, transfers, and purchases that have divested GHM of its then-existing assets, without any attempt to achieve or pursue a proper corporate purpose. GHM did not receive adequate consideration for the transactions that Goldstein executed.  These acts and omissions, among others, constitute waste of corporate assets that proximately caused GHM injury.  As a direct and proximate result of this harm, GHM has suffered substantial damages greatly in excess of the minimum jurisdictional requirements of this Court, for which Plaintiff hereby sues.

## COUNT SEVEN: PLAINTUFF'S NEGLIGENCE/GROSS NEGLIGENCE CLAIMS AGAINST GOLDSTEIN

66.     Plaintiff hereby incorporates by reference the factual allegations contained in the preceding paragraphs as if set forth verbatim.  The actions and omissions alleged in the preceding paragraphs, including but not limited to not following rudimentary standards of corporate governance and basic standards of financial management, whether taken separately or collectively, demonstrate a willful or conscious disregard or reckless indifference to the rights and interests of GHM. These actions and/or omissions therefore constitute gross negligence on the part of Goldstein.

67.    A director, officer, or partner similarly situated as Goldstein, would have objectively viewed the above acts and/or omissions as involving an extreme degree of risk to GHM, considering the probability and magnitude of the potential harm to GHM. Goldstein had actual subjective awareness of the risks involved in breaching his duties, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of GHM. The grossly negligent conduct of GHM proximately caused the losses and harm sustained by GHM. Moreover, Goldstein owed a duty of reasonable care to GHM. Goldstein's acts and/or omissions, as detailed above, constitute breaches of the duties that he owed to GHM and proximately caused severe financial injury and harm to GHM, for which GHM hereby sues.

## COUNT EIGHT: PLAINTIFF'S CLAIMS AGAINST SORENSON AND GOLDSTEIN FOR CONSPIRACY TO TORTIOUSLY INTERFERE WITH BUSINESS RELATIONSHIPS AND CONTRACTS

68.    Plaintiff hereby incorporates by reference the factual allegations contained in the preceding paragraphs as if set forth verbatim.

69.    GHM would show that Sorenson and Goldstein each acted together to interfere with GHM's business relationship and contract to act as General Partner of Cheaters, Ltd. Goldstein, with Sorenson's assistance, wrongfully attempted to oust GHM as General Partner and make Goldstein the General Partner and thereby deprive GHM of valuable property rights in episodes of the television show "Cheaters".

70.    Sorenson's actions, including his letter dated February 13, 2003 soliciting the limited partners to ratify the attempted wrongful ouster of GHM as General Partner of

Cheaters, Ltd. and the revocation of the License Agreement, were performed with a meeting of minds with his client, Goldstein.

71.     Sorenson knew that Goldstein's actions in attempting to oust GHM as Cheaters, Ltd.'s General Partner were done without legal authority. Despite such knowledge, Sorenson aided and abetted Goldstein by attempting to purportedly effectuate the attempted wrongful ouster by communicating false and misleading information to the limited partners and seeking their approval to amend the Limited Partnership Agreement.

72.     As a result of Sorenson's unlawful interference and his conspiracy with Goldstein to wrongfully interfere, GHM has suffered substantial damages for which it now sues. GHM would also show that Sorenson's actions were of a nature that the law allows for the imposition of exemplary damages in that Sorenson acted with malice as that term is defined in §41.001(7) of the Texas Civil Practices and Remedies Code.

## COUNT NINE: PLAINTIFF'S CLAIMS FOR CONSPIRACY FOR CONVERSION AGAINST SORENSON

73.     Plaintiff hereby incorporates by reference the factual allegations contained in the preceding paragraphs as if set forth verbatim.

74.     GHM would show that the actions by Sorenson described above constitute a conspiracy with Goldstein to convert property and rights rightfully belonging to GHM, to legally effectuate the unlawful ouster of GHM as General Partner of Cheaters, Ltd., and to unlawfully revoke the License Agreement.   By these actions, Sorenson was attempting to aid and abet the conversion of past and future episodes of Cheaters. Such actions resulted in substantial harm to GHM.

75. As a result of Sorenson's unlawful interference and his conspiracy with Goldstein to wrongfully interfere, GHM has suffered substantial damages for which it now sues. GHM would also show that Sorenson's actions were of a nature that the law allows for the imposition of exemplary damages in that Sorenson acted with malice as that term is defined in §41.001(7) of the Texas Civil Practices and Remedies Code.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff requests that Defendant Goldstein, Defendant Sorenson, Defendant Cheaters, Ltd., and GHM be cited to appear and answer herein, and that upon final trial Plaintiff have judgment against Defendant Goldstein, Defendant Sorenson, Defendant Cheaters, Ltd., and GHM for:

1. Actual damages in an amount greatly in excess of the minimum jurisdictional limits of this Court;

2. An accounting;

3. Reasonable and necessary attorneys' fees;

4. Pre and post-judgment interests at the maximum rate allowable by law;

5. Costs of court;

6. An award of exemplary damages; and

7. Such other and further relief, in law and in equity, to which Plaintiff may show itself to be justly entitled.

Respectfully submitted,

**BERGMAN & BIRD, L.L.P.**

Andrew A. Bergman
State Bar No. 02196300
Paul A. Sartin
State Bar No. 24034668
4514 Travis Street, Suite 300
Dallas, Texas 75205
Telephone (214) 528-2444
Facsimile  (214) 599-0602

**ATTORNEYS FOR PLAINTIFF
TOMMY HABEEB, as a shareholder
of Goldstein/Habeeb/McCalmont
Entertainment, Inc.**

## CERTIFICATE OF SERVICE

I, Andrew A. Bergman, do hereby certify that a true and correct copy of the foregoing document has been served on the following via the method indicated on this the ___ day of May, 2004.

Andrew A. Bergman

Mr. Timothy W. Sorenson          **VIA HAND DELIVERY**
1717 Main Street, Suite 4050
LB #39
Dallas, Texas 75201

Mr. Norton Rosenthal          **VIA HAND DELIVERY**
1717 Main Street, Suite 5500
Dallas, Texas 75201

Ms. Alison Moore          **VIA HAND DELIVERY**
Thompson Coe Cousins & Irons, LLP
Plaza of the Americas
700 North Pearl Street, 25th Floor
Dallas, Texas 75201

Mr. Paul Hood          **VIA HAND DELIVERY**
1717 Main Street, Suite 5500
Dallas, Texas 75201

Exh.
2



CAUSE NO. DV-03-13229-L

| | | |
|---|---|---|
| TOMMY HABEEB, as a shareholder | § | |
| of Goldstein/Habeeb/McCalmont | § | |
| Entertainment, Inc., | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| | § | |
| vs. | § | 193rd JUDICIAL DISTRICT |
| | § | |
| ROBERT N. GOLDSTEIN, TIMOTHY | § | |
| W. SORENSON, GOLDSTEIN/HABEEB | § | |
| McCALMONT ENTERTAINMENT, | § | |
| INC. and CHEATERS, LTD. | § | DALLAS COUNTY, TEXAS |

FILED

APR 2 2004

DISTRICT CLERK, DALLAS CO., TEXAS

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants, Robert N. Goldstein (Goldstein), Goldstein/Habeeb/McCalmont Entertainment, Inc. (GHE), Cheaters, Ltd. (Cheaters) and Timothy W. Sorenson file this Motion for Summary Judgment on all of the claims of Tommy Habeeb, Plaintiff, against the Defendants, and in support of same would respectfully show the following:

### I.
### Operative Facts

The summary judgment evidence herein is comprised of the pleadings on file and the affidavits and exhibits attached hereto. The summary judgment evidence shows the following:

1.01    On or about February 6, 2003, each Defendant herein jointly filed suit against the Plaintiff in the United States District Court for the Northern District of Texas, Dallas Division, in Cause No.3-03-CV-0266N (the "Federal Action") asserting claims against the Plaintiff herein for copyright and trademark infringement, for breach of the Plaintiff's fiduciary duty as a director of GHE, for usurpation of GHE's corporate opportunities, and for disparaging the business of GHE. A true copy of the Defendants' operative pleading in the Federal Action is attached hereto as Exhibit "A" and is incorporated herein by reference.

1.02    On or about December 30, 2003, Defendant filed his First Amended Answer to Plaintiffs' First Amended Complaint in the Federal Action, wherein Defendant admitted that the



Plaintiffs' tort claims arose out of a common nucleus of operative facts as Plaintiffs' infringement claims. A true copy of the Defendant's First Amended Answer to Plaintiffs' First Amended Complaint is attached hereto as Exhibit "B" and is incorporated herein by reference.

1.03    Cause No. 3-03-CV-0266N was  resolved by Agreed Judgment against the Plaintiff entered on January 6, 2004. A true copy of the Agreed Judgment  in the Federal Action is attached hereto as Exhibit "C" and is incorporated herein by reference.

1.04    On December 17, 2003, three weeks before agreeing to the Agreed Judgment in Cause No. 3-03-CV-0266N, the Plaintiff herein filed this suit against all of the Defendants herein and against their attorney in the Federal Action  (the "State Court Action").

1.05     Plaintiff failed to serve the State Court Action on any of the Defendants herein before January 28, 2004, which is three weeks after Plaintiff had signed the Agreed Judgment in the Federal Action. (See affidavit of Timothy W. Sorenson at Exhibit "E" attached hereto and incorporated herein by reference).

1.06    During the course of the Federal Action, Plaintiff (Defendant therein) answered interrogatories affirmatively stating that Plaintiff then had claims against the Defendants (Plaintiffs therein) for breach of contract. A true copy of the Defendant's Answers to Interrogatories is attached to Sorenson's affidavit at Exhibit "E" and is incorporated herein by reference.

1.07    During the course of the Federal Action, Plaintiff was deposed and testified to the effect that he was asserting claims against Goldstein for breach of fiduciary duty. A true copy of the relevant portions of Defendant's testimony is attached to Sorenson's affidavit at as Exhibit "E" and is incorporated herein by reference.

1.08    During the course of the Federal Action the parties exchanged approximately 2000 pages of documents covering the period from February, 1998, through March, 2003. (See affidavit of Timothy W. Sorenson at Exhibit "E" attached hereto and incorporated herein by reference).

Motion for Summary Judgment

1.09    Plaintiff does not have, and never has had, any interest in and to Cheaters. Ltd.. A true copy of the Limited Partnership Agreement is attached hereto as Exhibit "F" and incorporated herein by reference.

1.10    Sorenson is not now and never has represented the Plaintiff.

## II.
## Applicable Law

Plaintiff is barred by the doctrines of res judicata, collateral estoppel and judicial estoppel from recovering on any of the claims Defendant asserts herein:

2.01    Under the All Writs Act, a federal court has the power to enjoin a party from attempting to relitigate the same issues or related issues precluded by the principles of *res judicata* and collateral estoppel in federal court. *Kinnear-Weed Corp. v. Humble Oil & Refining Co., 441 F.2d 631, 637 (5th Cir.), cert. denied, 404 U.S. 941, 30 L. Ed. 2d 255, 92 S. Ct. 285 (1971); Kentucky Fried Chicken, Corp. v. Diversified Packaging, 552 F.2d 601, 603 (5th Cir. 1977); see also Santopadre v. Pelican Homestead & Sav. Assn., 937 F.2d 268, 273 (5th Cir. 1991);* 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE P 131.53 (3d ed. 1997). Accordingly, a federal court may issue an injunction to restrain the parties from pursuing such issues in another court. *Life Insurance Co. V. Deshotel, 142 F.3d 873, 879 (5th Cir. 1998)* citing 7 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1717, at 616; New York; *Pan Am. Fire & Cas. Co. v. Revere, 188 F. Supp. 474, 484 n.49 (E.D. La. 1960);* and *28 U.S.C.A. § 2283* revision notes (West 1994). This is a widely recognized exception to the Anti-Injunction Act, *28 U.S.C. § 2283* which prohibits a federal court from granting an injunction to stay proceedings in a state court "except as expressly authorized by an Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.".

2.02    Federal law determines a judgment's preclusive effect. *Recoveredge L.P. v. Pentecost, 44 F.3d 1284, 1290 & n.11 (5th Cir. 1995).* An agreed judgment has the same effect as a judgment on the merits after an adversarial proceeding. Defendant's Agreed Judgment is



entitled to full *res judicata* effect. *United States v. Shenbaum, 10 F3d. 305, 313 (5ᵗʰ Cir. 1994).*

2.03    *Res judicata* is a judicially-created doctrine that has long been applied by the federal courts to prevent repeated litigation of the same claims and issues by the same parties. In addition to protecting litigants from the burden and vexation of multiple lawsuits, the doctrine fosters judicial economy and promotes the finality and certainty of judgments. *See Allen v. McCurry, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980)* (recognizing that *res judicata* serves to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.") Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and could have been litigated in the prior action. *Barr v. Resolution Trust Corp., 837 S.W.2d 627, 631 (Tex. 1992).* For *res judicata* to apply four conditions must be satisfied. First, the parties in the subsequent action must be identical to, or in privity with, the parties in the prior action. Second, the judgment in the prior case must have been rendered by a court of competent jurisdiction. Third, the prior action must have concluded with a final judgment on the merits. Fourth, both suits must involve the same claim or cause of action *Ellis v. American Life Insurance Co., 211 F.3d 935, 937 (5th Cir. 2000).; Amstadt v. United States Brass Corp., 919 S.W.2d 644, 652 (Tex. 1996).* With respect to the final condition, whether the same claim or cause of action is involved in both suits, the Fifth Circuit applies a transactional test of the Restatement § 24. *B.R. Eubanks, M.D. v. Federal Deposit Ins. Corp., 977 F.2d 166, 171 (5th Cir. 1992).* Under this approach, the critical issue is whether the two actions are based on the "same nucleus of operative facts." *Id.* This inquiry requires the court to look at the factual predicate of the claims asserted, not the legal theories upon which a plaintiff relies.

2.04    Collateral estoppel "'is limited to matters distinctly put in issue, litigated, and determined in the former action.'" *Brister v. A.W.I., Inc., 946 F.2d 350, 354 (5th Cir. 1991)* (quoting *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co., 430 F.2d 38, 45 (5th Cir. 1970)).* Collateral estoppel encompasses three elements: "(1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in

the prior action; and (3) the determination of the issue in the prior action must have been a necessary part of the judgment in that earlier action." *Recoveredge, 44 F.3d at 1290;* see *Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.), 163 F.3d 925, 932 (5th Cir. 1999),* petition for cert. filed, *67 U.S.L.W. 3643* (U.S. Apr. 12, 1999); *Meza v. General Battery Corp., 908 F.2d 1262, 1273 (5th Cir. 1990).* Moreover, the legal standard used to assess the issue must be the same in both proceedings. See *Recoveredge, 44 F.3d at 1291.* However, the actual claims and the subject matter of each suit may differ. See *id.* Finally, "unlike claim preclusion, the doctrine of issue preclusion may not always require complete identity of the parties." *Meza, 908 F.2d at 1273.* It does not matter that the claims in each suit are different, or that the subject matter of each suit is different, so long as the issue litigated in each suit is identical. See *Recoveredge, 44 F.3d at 1291* ("Collateral estoppel will apply in a second proceeding that involves separate claims if the claims involve the same issue . . . and the subject matter of the suits may be different as long as the requirements for collateral estoppel are met."); *RESTATEMENT (SECOND) OF JUDGMENTS § 27* (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.") (emphasis added). There need not be complete identity of parties for collateral estoppel to apply. See *Meza, 908 F.2d at 1273;* see also *Royal Ins. Co. v. Quinn-L Capital Corp., 960 F.2d 1286, 1289, 1291, 1297 (5th Cir. 1992)* (applying collateral estoppel principles in upholding injunction under relitigation exception even though parties enjoined in second action were not identical to those in first action that was deemed to have preclusive effect).

2.05    The principles of *res judicata* and collateral estoppel apply to a compulsory counterclaim, and a failure to plead the counterclaim bars a party to a federal judgment from bringing what is otherwise a compulsory counterclaim as a later independent action. *See Dillard v. Security Pac. Brokers, Inc., 835 F.2d 607, 609 (5th Cir. 1988); Cleckner, v. Republic Van and Storage Company, Inc., 556 F.2d 766 (5th Cir.1977;* and *Ake v. Chancey, 149 F.2d 310 (5th Cir. 1945). Dillard* stresses that causes of action that arose before suit was filed are barred. All of the causes of action asserted by Defendant in



the State Court Action arose before the filing of the Federal Action, except those asserted against Sorenson, which arose during the pendency of the Federal Action.

2.06    Compulsory counterclaims are addressed by Federal Rule of Civil Procedure 13(a), which reads:

> [a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

In making a determination of whether a claim is a compulsory counterclaim, courts should ask (1) whether the issues of fact and law raised by the claim and counterclaim largely are the same; (2) whether *res judicata* would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; and (4) whether there is any logical relationship between the claim and the counterclaim. *Park Club, Inc. v. Resolution Trust Corp., 967 F.2d 1053, 1058 (5th Cir.1992)* (citing *Plant v. Blazer Finan. Servs., 598 F.2d 1357, 1360 (5th Cir.1979)).* If any of these four questions results in an affirmative answer then the counterclaim is compulsory. *Id.*

2.07    "A counterclaim which is compulsory but is not brought is thereafter barred." *Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 469 n. 1, 94 S. Ct. 2504, 2506 n. 1, 41 L. Ed. 2d 243 (1974); Cleckner v. Republic Van & Storage Co., supra* at *768-69.*

2.08    Though not a party to the Federal Action, Sorenson, as the Plaintiff's attorney therein, was patently in privity with each of the Plaintiffs.. "Parties in privity count as identical parties for federal *res judicata* purposes." *Bradley v. Armstrong Rubber Co., 130 F.3d 168, 179 (5th Cir. 1997).*This is especially true where, as in the Federal Action, the Defendant was under an affirmative duty to bring to this Courts attention Sorenson's alleged fraudulent actions and conflict of interest Defendant now complaints of in the

Plaintiff's Motion for Summary Judgment

State Court Action. See *Texas Disciplinary Rules of Professional Conduct, Rules 3.03(a)(2), 8.03(a), and 8.04(a)*

## III.
## Arguments

3.01    The transactional period of time involved in both the Federal Action and the State Court Action is February, 1998, through March, 2003.

3.02    The transactional relationship involved in both the Federal Action and the State Court Action is Plaintiff's participation as a director and shareholder of GHE and GHE's relationship with Goldstein and Cheaters, Ltd. during the transactional period.

3.03    The nucleus of operative facts in the Federal Action and the State Court Action is identical. The facts are governed by the same 2000 pages of documents produced in the Federal Action.

3.04    In the Federal Action Defendants (Plaintiffs therein) complained of Plaintiff's business disparagement of Goldstein and GHE when Plaintiff published the statement, "I can tell you directly and simply, I did not leave the show by choice, but to the contrary I have been forced out by unlawful greed to which I cannot fully comment on due to pending litigation.". Plaintiff (Defendant herein) admits publishing that statement before the Federal Action was filed against Defendant. Truth is an absolute defense to the business disparagement complained of by Plaintiffs. *Forbes v. Granada Biosciences, Inc. 124 S.W.3d 167, (Tex.2003); Basic Capital management, Inc. v. Dow Jones & Company, 96 SW3d 475, (Tex..Civ.App.-Austin, 2002)*. One must presume that the breach of fiduciary duties, the conversion, the corporate waste, the gross negligence, the tortuous interference and the conspiracies about which the Plaintiff complains herein constitute the "unlawful greed" to which Plaintiff referred in the aforesaid quote.. As absolute defenses to the Plaintiffs' claims for business disparagement, such claims were compulsory counterclaims in the Federal Action.



3.05   In their First Amended Complaint for Damages, Interpleader and Permanent Injunction
filed in the Federal Action, Defendants herein put the license agreements between
Goldstein and GHE and Cheaters, Ltd. directly into contention:

> 3.04   On or about August 10, 1998, Goldstein granted an
> exclusive license to the original program concept GHE for
> the purpose of developing and producing a television video
> tape to be used as a pilot for the publication, sale and
> syndication of the original program concept. GHE
> produced the program concept pilot film and published it in
> October 1998.

> 3.05   On or about August 25, 1999, with Goldstein's consent,
> GHE assigned its exclusive license to the program concept
> to Cheaters for the purpose of developing and producing a
> television video tape series to be sold, published and
> syndicated from the original program concept. Cheaters has
> produced, developed and published sixty one-hour films
> from the original concept, and is in the process of
> producing additional television video tapes from the
> original program concept.    The program has been
> broadcast locally and nationally, is a "hit," and has a
> substantial audience.

Plaintiff's claims of breach of contract and of the license agreements herein were
therefore compulsory counterclaims in the Federal Action.

3.06   Defendants, as Plaintiffs in the Federal Action, sought and obtained equitable relief. The
defense of "unclean hands" is an affirmative defense to an equitable claim. "Unclean
hands" is the very essence of the Plaintiff's claims herein. The Plaintiff's claims of
breach of fiduciary duties, conversion, corporate waste, gross negligence, tortuous
interference and conspiracies asserted in this action constitute "unclean hands" as a
matter of law and an absolute defense to the Defendants' claim for equitable relief.
Plaintiff's claims were therefore compulsory counterclaims in the Federal Action

3.06   That Plaintiff knew of all of his claims against the Defendants before he agreed to the
Agreed Judgment is evidenced by the filing of the State Court Action three weeks before
the Agreed Judgment was entered.

3.07   In this suit, Plaintiff sues the Defendants herein, and their attorney in the Federal Action,
derivatively of Plaintiff's rights as a shareholder in GHE. Plaintiff has no standing to

assert derivative claims against the Defendants herein, as "It is generally recognized that a stockholder who has acquiesced or participated in the acts giving rise to his claim has no standing to vindicate the rights of the corporation in the derivative action. . . . . The rule is designed, among other things, to prevent speculation by the stockholder on the results of corporate transactions, with the object of accepting the advantages if they turn out well or challenging them if they are not beneficial." *Bartels,* Citing *Rosenfeld v. Schwitzer Corporation, 251 F. Supp. 758, 762 (S.D. N.Y. 1966); George v. LeBlanc, 78 F.R.D. 281,285 (N.D.Tex.1977).*

3.08    Plaintiff is not now, and never has been, a limited partner in Cheaters, Ltd.. Defendant therefore has no standing to assert claims, if any,   belonging to Cheaters, Ltd. *Tex.Bus.Org. Code, §153.402.*

3.09    Sorenson owed no duty to Habeeb. *Barcelo v. Elliott, 923 SW2d 575,579(Tex.1996).*

## IV.
## Relief Sought

Plaintiffs request that after notice and hearing, the Court enter summary judgment that the Plaintiff take nothing herein.

Respectfully submitted,

Timothy W. Sorenson, Esquire
State Bar No.18848400
1717 Main Street, Suite 5500
Dallas, Texas 75201
Ph: (214) 698-8599
Fax: (214) 698-5999
Attorney for Defendant, Robert N. Goldstein

Joined by:

_(signature)_

Norton Rosenthal
Texas Bar No. 17281520
1717 Main Street, Suite 5500
Dallas, Texas 75201
Ph: (214) 743-4150
Fax: (214) 743-4151
Attorney for Plaintiff, Cheaters, Ltd.

PAUL M. HOOD, P.C.

By: _____
     Paul M. Hood
     Texas Bar No. 09943440

1717 Main Street, Suite 5500
Dallas, Texas 75201
Ph: (214) 373-3214
Fax: (214) 373-0843
Attorney for Plaintiff,
Goldstein/Habeeb/McCalmont Entertainment, Inc.

THOMPSON, COE, COUSINS & IRONS, L.L.P.

By: _(signature)_   Timothy Svenson
     Alison H. Moore        w/ permission
     State Bar No. 09836500

Plaza of the Americas
700 North Pearl Street, 25th Floor
Dallas, Texas 75201
Ph:(214) 871-8200
Fax: (214) 871-8209

Plaintiff's Motion for Summary Judgment

10

## CERTIFICATE OF CONFERENCE

I certify that on the 20th day of March, 2004, I conferred with Andrew Bergman, counsel for the Plaintiff, regarding the merits of the Defendants' Motion for Summary Judgment. Agreement could not be reached regarding the motion. Therefore, the matter is submitted to the Court for determination.

Respectfully submitted:

Original Signed By
**TIMOTHY W. SORENSON**

Timothy W. Sorenson

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Plaintiff's Motion for Summary Judgment has been served by hand delivery or certified mail, return receipt requested, upon all counsel of record in the above-styled and numbered cause in accordance with Rule 21a, Texas Rules of Civil Procedure, on this 31st day of March, 2004

Original Signed By
TIMOTHY W. SORENSON

Timothy W. Sorenson

## FIAT

The foregoing Motion for Summary Judgment is hereby set for hearing at _____ o'clock ___.m. on the _____ day of _____, 2004, in the Courtroom in and for the 101st Judicial District Court in Dallas, Dallas County, Texas.

**Signed** this _____ day of _____, 2004.

_____
**JUDGE PRESIDING**