**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN 3 0 2004

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| ROBERT N. GOLDSTEIN, | § | |
| GOLDSTEIN/HABEEB | § | |
| ENTERTAINMENT, INC., and | § | |
| CHEATERS, LTD., | § | |
|     Plaintiffs | § | CAUSE NO. 304CV-677-P |
| | § | |
| vs. | § | |
| | § | |
| TOMMY HABEEB | § | |
|     Defendant | § | |

*ORIGINAL*

## PLAINTIFFS' SUPPLEMENTAL APPENDIX TO
## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TAB G:**      *Dow Agrosciences, LLC v. Bates,* 5:01-CV-331-C (N.D.Tex. 2003) (*Dow II*)

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Plaintiffs' Supplemental Appendix has been served by hand delivery or certified mail, return receipt requested, upon all counsel of record in the above-styled and numbered cause in accordance with Rule 5, Federal Rules of Civil Procedure, on this _30th_ day of _June_, 2004

_____
Timothy W. Sorenson

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

```
U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
        FILED

        OCT 1 4 2003

CLERK, U.S. DISTRICT COURT
By _____
              Deputy
```

| | | |
|---|---|---|
| DOW AGROSCIENCES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DENNIS BATES, et al., | ) | |
| | ) | Civil Action No. |
| Defendants. | ) | 5:01-CV-331-C |

## ORDER

Came on for hearing Plaintiff's Motion for Injunctive Relief in the above-styled and
-numbered cause. Both parties appeared and announced ready.

The Court, having heard the evidence and argument of counsel, makes the following
findings of fact:

### FINDINGS OF FACTS

1.    DAS filed its Complaint for Declaratory Relief in this Court on December 21, 2001.

2.    DAS named the following persons and/or entities as the defendants: Dennis Bates,
Jimmy Burson, Benny Judah, d/b/a Clearwater Farms, Tommy Coleman, Richard Cox, Wayne
Davis, Burk Denman, Neil Friessen, Jake Froese, Thomas Fuston, Arthur Galvan, d/b/a G-5
Partnership, Greg Hughes, Sandra and Karl Don Hughes, d/b/a JH Cattle Co., Rudy Klassen, Ronnie
Love, Kevin Mathis, Brad Palmer, Kirk Parrish, d/b/a K-L Farms, Jerry Parrish, JoEvelyn Patterson
and Donald Gruben, Stacey Price, Benny Judah, d/b/a Progressive Farms, Morris Rushing, d/b/a Pea-
Cot Farms, Billy Shannon, Floyd Stokes, Craig West, and Frenchie Lee Wheeler.



3.      No Defendant moved for dismissal based on lack of jurisdiction over their persons, insufficiency of process, insufficiency of service of process, or failure to join a necessary party.

4.      Shortly after DAS filed its action in this Court, the named defendants and others allegedly different from the named defendants filed separate but parallel actions in state court in ten different Texas counties.

5.      The state court action filed on behalf of Burk Denman (and/or his estate) has been voluntarily dismissed.

6.      Through their counsel, the following named persons and/or entities have stipulated that their continued pursuit of their state law actions is barred by the doctrines of *res judicata* and collateral estoppel:  Dennis Bates, Jimmy Burson, Richard Cox, Wayne Davis, Neil Friessen, Jake Froese, Thomas Fuston, Greg Hughes, Sandra and Karl Don Hughes, d/b/a JH Cattle Co., Rudy Klassen, Ronnie Love, Kevin Mathis, Brad Palmer, Kirk Parrish, d/b/a K-L Farms, Jerry Parish, JoEvelyn Patterson, Donald Gruben, Stacey Price, Billy Shannon, Craig West, and Frenchie Lee Wheeler.

7.      Despite that stipulation, the above-listed persons and entities have refused to voluntarily dismiss their state court lawsuits.  Failure to do so represents a blatant disregard for the rulings of this Court as affirmed by the Fifth Circuit.

8.      The above-enumerated persons and entities have offered no evidence that they would be harmed if this Court enjoined their parallel state court actions.

9.      The only reason that the above-enumerated persons and entities have refused to voluntarily dismiss their parallel state court actions is that they are hedging their bets in the event the United States Supreme Court denies their pending petition for *writ of certiorari*.

2



10.  The above-enumerated persons and entities had a full and fair opportunity to litigate their disputes with DAS in this Court, and they did so.

11.  The above-enumerated persons and entities had a full and fair opportunity to seek appellate review of this Court's decision, and they did so.

12.  The above-enumerated persons and entities have a full and fair opportunity to seek relief from the United States Supreme Court, and they are currently pursuing that relief through their pending petition for *writ of certiorari*.

13.  Comanche Horizon Corporation, Clearwater Corporation, Progressive Ag, Inc., G-5 Partnership, Pea-Cot Farms, Inc., Sand Farms, Inc., Arthur Galvan, individually, and Morris J. Rushing, individually, contest the applicability of the doctrines of *res judicata* and collateral estoppel to the claims they have brought in their respective state court proceedings. These persons and/or entities may be referred to hereafter collectively as the "Resisting Growers," where the context is appropriate.

14.  The Resisting Growers clearly intend to resuscitate their eight remaining parallel state court actions against DAS. Almost immediately after the Fifth Circuit issued its decision, the Growers who are plaintiffs in the Gaines County state court action filed a motion to compel discovery and for sanctions against DAS.

### The Petition for *Writ of Certiorari* To The United States Supreme Court

15.  In their Petition for *Writ of Certiorari* filed before the United States Supreme Court, Petitioners state:

> None of the corporate Petitioners has a parent company and no publicly held
> company owns 10% or more of the stock of any such corporate Petitioner.

3



16.     In the caption of their Petition, however, Petitioners do not use the terms "Corporation" or "Inc." or any other such traditional corporate designator to identify any one of them.

17.     Because Petitioners expressly stated to the United States Supreme Court that corporate Petitioners appeared before it, the Resisting Growers who are corporations are estopped to deny their prior participation in these proceedings, the relationships of privity with parties admittedly properly before the Court, and/or their virtual representation by parties admittedly properly before the Court, all of which is discussed in more detailed findings below.

18.     Because Petitioners expressly stated to the United States Supreme Court that corporate Petitioners appeared before it, but did not use in their caption, or anywhere else within their Petition, traditional corporate designators such as "Corporation" or "Inc." to identify any one of them, the Resisting Growers are estopped to attach any significance to the fact that neither the captions in these proceedings nor DAS similarly did not use such designators.

### Floyd Stokes And Comanche Horizon Corporation

19.     In its original Complaint for Declaratory Relief in this Court, DAS named "Floyd Stokes" as one of the defendants.

20.     On September 4, 2001, Resisting Growers' counsel sent a pre-suit demand letter to DAS stating that "this law firm has been retained to represent Mr. Floyd Stokes, with respect to the claim he has against [DAS], regarding his purchase and use of Strongarm." Throughout that letter, all of the claims are made on behalf of Stokes. No similar letter was sent on behalf of Comanche Horizon Corporation ("Comanche Horizon").

4



21. Comanche Horizon is a Texas for-profit corporation that was formed on January 20, 1982.

22. DAS named Floyd Stokes as the declaratory judgment defendant in reliance on Resisting Growers' counsel's representations.

23. Stokes asserted in his answer that he was sued in an incorrect capacity, but he made no effort to obtain his dismissal from this action, nor did he make any effort to get himself dropped as a misjoined party.

24. Stokes made no effort to seek dismissal on the grounds that Comanche Horizon was an indispensable but absent party.

25. On April 10, 2002, the named defendants and others filed their motion for leave to file a First Amended Counterclaim.

26. The motion for leave to file a First Amended Counterclaim identifies the defendants and counterclaimants as including "Comanche Horizon Corporation."

27. The "Debtor's Statement of Financial Affairs and Schedules" filed in Comanche Horizon's bankruptcy action in the U.S. Bankruptcy Court for the Northern District of Texas (Case No. 01-50526-11) (filed May 29, 2001) confirms that Stokes is both the President and the only stockholder of Comanche Horizon. Schedule A in that bankruptcy action lists all the real property owned or leased by Comanche Horizon and all of the farms that comprise the claim are on that list.

28. For at least the years 2000-2002, Stokes was also Comanche Horizon's registered agent.

29. The Grower Questionnaire sent by DAS to ascertain information about Strongarm claims were all filled out by "Floyd Stokes/Comanche Horizon Corp."



30.    The operator/producer poundage summary that relates to Farm No. 1001 lists Comanche Horizon as the "Operator," and is signed by Stokes. No other owners are listed.

31.    The operator/producer poundage summaries that relate to Farm Nos. 402, 640, 639, and 668 all list "Comanche Horizon Corporation" as the operator, and are signed as follows: "Comanche Horizon Corp. Floyd Stokes."

32.    All of the shipping records for Comanche Horizon have a letterhead on which Stokes is listed at the same address and phone number as the corporation.

33.    FSA 1007 forms for Farm Nos. 1550, 1677, and 2000 all show Comanche Horizon Corp./Comm. Lien as a 100% owner.

34.    FSA 1007 forms for Farm Nos. 474, 1001, and 668 show "Comanche Horizon Corporation" as a 100% owner.

35.    "Floyd Stokes" was a participant in the appeal to the Fifth Circuit seeking reinstatement of claims against DAS.

36.    "Floyd Stokes" is currently among the petitioners seeking a *writ of certiorari* to the United States Supreme Court from the Fifth Circuit's decision affirming this Court's Order granting summary judgment in favor of DAS and against the counterclaimants.

37.    Neither this Court's entry of summary judgment in favor of DAS and against the counterclaimants, nor the Fifth Circuit's affirmance of same, imposed a money judgment against Floyd Stokes or otherwise imposed any affirmative obligation upon him.

38.    Stokes did not argue to the Fifth Circuit that he was sued and served in the wrong capacity or in an incorrect manner.

6

128

39.     Stokes does not argue to the United States Supreme Court that he was sued and served in the wrong capacity or in an incorrect manner.

40.     Having failed to seek an adjudication in this Court of the question whether he was sued and served in the wrong capacity or in an incorrect manner, and by failing to raise that issue in the Fifth Circuit, let alone before the United States Supreme Court, Stokes has waived any issues relating to the capacity or manner in which he was sued and served.

41.     Stokes disclaims having any personal or individual claim against DAS. The only claim to be reinstated that Stokes could have asserted to the Fifth Circuit, therefore, and the only claim he currently asserts to the United States Supreme Court, is the claim of Comanche Horizon.

42.     Despite filing an affidavit in opposition to DAS motion for injunctive relief, and despite the opportunity to present evidence at the October 1, 2003, hearing, Stokes offers no evidence or argument explaining his participation in the Fifth Circuit appeal or in the pending petition for *writ of certiorari* to the United States Supreme Court as being for any purpose other than to serve as the virtual representative of Comanche Horizon.

43.     On January 10, 2002, the United States Bankruptcy Court for the Northern District of Texas appointed Harvey L. Morton as trustee for Comanche Horizon.

44.     Comanche Horizon's trustee in bankruptcy, Harvey L. Morton, filed an affidavit in opposition to DAS' motion for injunctive relief.

45.     DAS objected to the conclusory and factually-unsupported in Mr. Morton's affidavit, including his statements of legal conclusion and legal argument. DAS' objection is meritorious and all statements made by Mr. Morton, other than statements of fact, are hereby stricken.



46. Mr. Morton does not explain Stokes' participation in the appeal to the Fifth Circuit or his current participation in the pending petition for *writ of certiorari* to the United States Supreme Court.

47. Mr. Morton does not claim that Stokes' participation in these proceedings or the continued proceedings on appeal and to the United States Supreme Court as described was undertaken contrary to his instructions, contrary to his wishes, or without his agreement and consent.

48. Mr. Morton does not claim that Stokes failed adequately to represent Comanche Horizon's interests in the prior proceedings, in the appeal to the Fifth Circuit, or that he is not now adequately representing Comanche Horizon's interests in the pending petition for *writ of certiorari* to the United States Supreme Court.

49. Mr. Morton has acquiesced in Stokes' participation in these proceedings as described and has thereby ratified Stokes' virtual representation of Comanche Horizon in these and the continuing appellate proceedings herein.

50. Mr. Morton is estopped to deny Stoke's virtual representation of Comanche Horizon in these and the continuing appellate proceedings herein.

51. The only available inference to be drawn is that Floyd Stokes participated in the appeal to the Fifth Circuit and is participating now in the pending petition for *writ of certiorari* to the United States Supreme Court, as the virtual representative of Comanche Horizon.

52. As President, sole shareholder and registered agent of Comanche Horizon, there is an express or implied legal relationship between Stokes and Comanche Horizon and its bankruptcy trustee whereunder Stokes is accountable to Comanche Horizon and to its bankruptcy trustee for his conduct of and participation in these proceedings.

8

53. Stokes and Comanche Horizon are in privity with each other.

54. Stokes and Comanche Horizon are estopped to deny that they are in privity with each other.

55. Stokes and Comanche Horizon are estopped to deny that Stokes has served, and is now serving, as Comanche Horizon's virtual representative in these and the continuing appellate proceedings herein.

56. Stokes' interests and Comanche Horizon's interests in these proceedings and in the claims against DAS are more than closely aligned, they are identical.

57. Neither Mr. Morton nor any officer or agent of Comanche Horizon has offered evidence that Comanche Horizon was prejudiced or disadvantaged by Stokes' virtual representation of Comanche Horizon.

58. Comanche Horizon suffered no prejudice or disadvantage as a consequence of Stokes' virtual representation of it.

59. Stokes adequately represented Comanche Horizon's interests in these proceedings and there are no facts to suggest that Stokes is not now adequately representing Comanche Horizon in the pending petition for *writ of certiorari* in the United States Supreme Court.

60. Stokes is now, and throughout the course of these proceedings has been, the virtual representative of Comanche Horizon.

61. Comanche Horizon sued DAS in Texas state court on January 23, 2002, in the District Court for the 106th Judicial District, Gaines County, Texas.

62. By spontaneously and voluntarily appearing before the Court through its participation in the April 10, 2002, motion for leave to assert amended counterclaims, however, Comanche

9



Horizon became a *de facto* intervenor in these proceedings and submitted itself to the personal jurisdiction of this Court. Similarly, this Court acquired subject matter over the dispute between Comanche Horizon and DAS.

63.     The Court acquired personal jurisdiction over Comanche Horizon on April 10, 2002.

64.     The Court acquired subject matter jurisdiction over the claims Comanche Horizon possessed against DAS on April 10, 2002.

65.     The issues raised in the Comanche Horizon's state court action are identical to the issues adjudicated by this Court and the Fifth Circuit and they relate to an identical core of operative facts.

66.     The claims made in Comanche Horizon's state court action are identical to the claims adjudicated by the Court and the Fifth Circuit, they relate to an identical core of operative facts, and they are identical to the counterclaims Comanche Horizon sought leave to assert, and obtained leave to assert, in these proceedings.

67.     DAS' motion for injunctive relief against Comanche Horizon is not a collateral attack on this Court's Order dated June 25, 2002, denying DAS' motion to alter or amend the judgment to specifically denominate Comanche Horizon as a defendant because DAS did not request the Court to adjudicate and decide the question whether Stokes and Comanche Horizon are in privity with each other or the question whether Stokes was at that time, or in the subsequent and pending appellate proceedings, serving as Comanche Horizon's virtual representative.

68.     The bankruptcy stay against DAS' claims against Comanche Horizon was lifted on June 7, 2002.

10

69.     Stokes participated in the appeal to the Fifth Circuit after the bankruptcy stay against Comanche Horizon was lifted. Thus, the Fifth Circuit's affirmance of this Court's Order and Judgment thereafter does not offend any provision of the Bankruptcy Code.

70.     Regardless of the bankruptcy stay as to DAS' declaratory judgment claims against Comanche Horizon, Comanche Horizon had authority from the bankruptcy court to pursue its own claims against DAS. The bankruptcy stay was not and is not offended by the application of *res judicata* and collateral estoppel principles to the claims that Comanche Horizon was granted leave to pursue in this Court. The fact that Comanche Horizon chose not to pursue its claims in this forum, despite moving for and being granted leave to do so, does not disturb this finding.

71.     Comanche Horizon has not dismissed its state court action and, unless otherwise enjoined by this Court, it will continue to prosecute its state court action.

**Benny Judah, Clearwater Farms, and Progressive Farms**

72.     In its original "Complaint for Declaratory Relief" in this Court, DAS named "Benny Judah, d/b/a Clearwater Farms" and "Benny Judah, d/b/a Progressive Farms" as defendants.

73.     Two separate demand letters from Resisting Growers' counsel to DAS stated that his firm had been retained to represent "Clearwater Farms, owned by Mr. Benny Judah," and

74.     "Progressive Farms, owned by Mr. Benny Judah." Those letters did not mention any corporate identifier such as "Inc." or "Corporation."

75.     DAS named "Benny Judah, d/b/a/ Clearwater Farms" and "Benny Judah, d/b/a Progressive Farms" as declaratory judgment defendants in reliance on Resisting Growers' counsel's representations.

133

76.    "Benny Judah d/b/a Clearwater Farms" and "Benny Judah d/b/a Progressive Farms" identified themselves as "Defendants and Counter-Plaintiffs" in the Growers' April 10, 2002 motion for leave to file their First Amended Counterclaim, and that counterclaim in fact included claims brought by "Benny Judah d/b/a Clearwater Farms" and "Benny Judah d/b/a/ Progressive Farms."

77.    "Benny Judah d/b/a Clearwater Farms" and "Benny Judah d/b/a Progressive Farms" identified themselves as "Interested Parties" in the appeal to Fifth Circuit seeking reinstatement of their counterclaims.

78.    "Benny Judah, doing business as Clearwater Farms" and "Benny Judah doing business as Progressive Farms" are among the petitioners seeking a *writ of certiorari* to the United States Supreme Court from the Fifth Circuit's decision.

79.    Benny Judah is the President of Progressive Ag, Inc.

80.    Benny Judah is the President of Clearwater Corporation.

81.    Resisting Growers' counsel's "cover sheet" shows Benny Judah as the "owner" of "Clearwater Corp."

82.    Benny Judah owns Clearwater Corporation.

83.    The FSA-156 Report for Farm No. 786 lists "Clearwater Corp." as both the "Owner" and the "Operator." No other owners are listed.

84.    Resisting Growers' counsel's "cover sheet" shows Benny Judah as the "owner" of "Progressive Ag., Inc."

85.    Benny Judah owns Progressive Ag, Inc.

86.    The FSA 1007 sheet for Farm No. 1566 lists "Progressive Ag., Inc." as the Operator.

134

87.     The FSA 1007 Inspection Certificate and Sales Memoranda list "Progressive Ag., Inc." as the 100% owner of Farm No. 1566.

88.     The FSA-156 Report for Farm No. 1566 lists "Progressive Ag., Inc." as both the "Owner" and the "Operator."

89.     Neither this Court's entry of summary judgment in favor of DAS and against the counterclaimants, nor the Fifth Circuit's affirmance of same, imposed a money judgment against Judah or otherwise imposed any affirmative obligation upon him.

90.     Judah did not argue to the Fifth Circuit that he was sued and served in the wrong capacity or in an incorrect manner. Judah does not argue to the United States Supreme Court that he was sued and served in the wrong capacity or in an incorrect manner.

91.     Having failed to seek an adjudication in this Court of the question whether he was sued and served in the wrong capacity or in an incorrect manner, and by failing to raise that issue in the Fifth Circuit, let alone before the United States Supreme Court, Judah has waived any issues relating to the capacity or manner in which he was sued and served.

92.     Judah disclaims having any personal or individual claim against DAS. The only claims to be reinstated that "Benny Judah d/b/a Clearwater Farms" and "Benny Judah d/b/a Progressive Farms" could have asserted to the Fifth Circuit, therefore, and the only claims he currently asserts to the United States Supreme Court, are the claims of Clearwater Corporation and Progressive Ag, Inc.

93.     Clearwater Farms, Inc., not "Clearwater Corporation," sued DAS in Texas state court on January 23, 2002, in the District Court for the 106th Judicial District, Gaines County, Texas.

13



94.     Clearwater Corporation and its President and owner, Benny Judah, ignored any applicable corporate formalities by bringing suit in Gaines County as "Clearwater Farms, Inc."

95.     Progressive Farms, Inc., not "Progressive Ag, Inc.," sued DAS in Texas state court on January 22, 2002, in the District Court for the 121st Judicial District, Yoakum County, Texas.

96.     Progressive Ag, Inc. and its President and owner, Benny Judah, ignored any applicable corporate formalities by bringing suit in Yoakum County as "Progressive Farms, Inc."

97.     By ignoring corporate formalities in bringing suit in Texas state court using incorrect names of the corporations, Clearwater Corporation and Progressive Ag, Inc. and their mutual President and owner, Benny Judah, are estopped to assert such corporate formalities in these proceedings.

98.     Clearwater Corporation does not claim or offer evidence that Judah's participation in these proceedings, the appeal to the Fifth Circuit, or in filing the petition for *writ of certiorari* to the United States Supreme Court as described was undertaken contrary to the corporation's best interests or that Judah's conduct was unauthorized or *ultra vires*.

99.     Clearwater Corporation does not claim or offer evidence that Judah failed adequately to represent Clearwater Corporation's interests in the prior proceedings, in the appeal to the Fifth Circuit, or that he is not now adequately representing Clearwater Corporation's interests in the pending petition for *writ of certiorari* to the United States Supreme Court.

100.    As President and owner of Clearwater Corporation, there is an express or implied legal relationship between Judah and Clearwater Corporation whereunder Judah is accountable to Clearwater Corporation for his conduct of and participation in these proceedings.

14



101.  There is no evidence that any person other than Judah makes the decisions for Clearwater Corporation with respect to its business, financial and legal affairs, or that any person but Judah has those responsibilities.

102.  Judah is responsible for and makes the decisions for Clearwater Corporation with respect to its business, financial and legal affairs.

103.  Clearwater Corporation has acquiesced in Judah's participation in these proceedings as described and has thereby ratified Judah's virtual representation of Clearwater Corporation in these and the continuing appellate proceedings herein.

104.  Clearwater Corporation is estopped to deny Judah's virtual representation of it in these and the continuing appellate proceedings herein.

105.  The only available inference to be drawn is that Benny Judah and Benny Judah d/b/a Clearwater Farms participated in these proceedings, the appeal to the Fifth Circuit, and are participating now in the pending petition for *writ of certiorari* to the United States Supreme Court, as the virtual representatives of Clearwater Corporation.

106.  Judah and Clearwater Corporation are in privity with each other.

107.  Judah and Clearwater Corporation are estopped to deny that they are in privity with each other.

108.  Judah and Clearwater Corporation are estopped to deny that Judah has served, and is now serving, as Clearwater Corporation's virtual representative in these and the continuing appellate proceedings herein.

15



109. Benny Judah's and Benny Judah d/b/a Clearwater Farms' interests and Clearwater Corporation's interests in these proceedings and in the subject matter of them, including the claims against DAS, are more than closely aligned, they are identical.

110. Neither Judah nor any officer or agent of Clearwater Corporation has offered evidence that Clearwater Corporation was prejudiced or disadvantaged by Judah's virtual representation of Clearwater Corporation in these proceedings.

111. Clearwater Corporation suffered no prejudice or disadvantage as a consequence of Judah's virtual representation of it in these proceedings.

112. Benny Judah and Benny Judah d/b/a Clearwater Farms adequately represented Clearwater Corporation's interests in these proceedings and there are no facts to suggest that Benny Judah and Benny Judah d/b/a Clearwater Farms are not now adequately representing Clearwater Corporation in the pending petition for *writ of certiorari* in the United States Supreme Court.

113. Benny Judah and/or Benny Judah d/b/a Clearwater Farms are now, and throughout the course of these proceedings they have been, the virtual representatives of Clearwater Corporation.

114. Benny Judah is now, and throughout the course of these proceedings has been, the virtual representative of Clearwater Corporation.

115. The claims made in "Clearwater Farms, Inc.'s" state court action are identical to the claims adjudicated by this Court and the Fifth Circuit, they relate to an identical core of operative facts, and they are identical to the counterclaims asserted in these proceedings by Benny Judah d/b/a Clearwater Farms.

16

116.    The issues raised in "Clearwater Farms, Inc.'s" state court action are identical to the issues adjudicated by this Court and the Fifth Circuit, they relate to an identical core of operative facts, and they are identical to the issues raised in these proceedings by Benny Judah d/b/a Clearwater Farms.

117.    Progressive Ag, Inc. does not claim or offer evidence that Judah's participation as described was undertaken contrary to the corporation's best interests or that Judah's conduct was unauthorized or *ultra vires*.

118.    Progressive Ag, Inc. does not claim or offer evidence that Judah failed adequately to represent Progressive Ag, Inc.'s interests in the prior proceedings, in the appeal to the Fifth Circuit, or that he is not now adequately representing Progressive Ag, Inc.'s interests in the pending petition for *writ of certiorari* to the United States Supreme Court.

119.    As President and owner of Progressive Ag, Inc., there is an express or implied legal relationship between Judah and Progressive Ag, Inc. whereunder Judah is accountable to Progressive Ag, Inc. for his conduct of and participation in these proceedings.

120.    There is no evidence that any person other than Judah makes the decisions for Progressive Ag, Inc. with respect to its business, financial, and legal affairs, or that any person but Judah has those responsibilities.

121.    Judah is responsible for and makes the decisions for Progressive Ag, Inc. with respect to its business, financial and legal affairs.

122.    Progressive Ag, Inc. has acquiesced in Judah's participation in these proceedings as described and has thereby ratified Judah's virtual representation of Progressive Ag, Inc. in these and the continuing appellate proceedings herein.

17

123. Progressive Ag, Inc. is estopped to deny Judah's virtual representation of it in these and the continuing appellate proceedings herein.

124. The only available inference to be drawn is that Benny Judah and/or Benny Judah d/b/a Progressive Farms participated in the prior proceedings, in the appeal to the Fifth Circuit, and are participating now in the pending petition for *writ of certiorari* to the United States Supreme Court, as the virtual representatives of Progressive Ag, Inc.

125. Judah and Progressive Ag, Inc. are in privity with each other.

126. Judah and Progressive Ag, Inc. are estopped to deny that they are in privity with each other.

127. Judah and Progressive Ag, Inc. are estopped to deny that Benny Judah and/or Benny Judah d/b/a Progressive Farms have served, and are now serving, as Progressive Ag, Inc.'s virtual representatives in these and the continuing appellate proceedings herein.

128. Neither Judah nor any officer or agent of Progressive Ag, Inc. has offered evidence that Progressive Ag, Inc. was prejudiced or disadvantaged by Judah's virtual representation of Progressive Ag, Inc.

129. Progressive Ag, Inc. suffered no prejudice or disadvantage as a consequence of Judah's virtual representation of it.

130. Benny Judah's and Benny Judah d/b/a Progressive Farms' interests and Progressive Ag, Inc.'s interests in these proceedings and in the subject matter of them, including the claims against DAS, are more than closely aligned, they are identical.

131. Benny Judah and/or Benny Judah d/b/a Progressive Farms adequately represented Progressive Ag, Inc.'s interests in these proceedings and there are no facts to suggest that Benny

18

Judah and/or Benny Judah d/b/a Progressive Farms are not now adequately representing Progressive Ag, Inc.'s interests in the pending petition for *writ of certiorari* in the United States Supreme Court.

132.    Benny Judah and Benny Judah d/b/a Progressive Farms are now, and throughout the course of these proceedings they have been, the virtual representatives of Progressive Ag, Inc.

133.    Benny Judah is now, and throughout the course of these proceedings has been, the virtual representative of Progressive Ag, Inc.

134.    The claims made in "Progressive Farms, Inc.'s" state court action are identical to the claims adjudicated by the Court and the Fifth Circuit, they relate to an identical core of operative facts, and they are identical to the counterclaims asserted by Benny Judah d/b/a Progressive Farms in these proceedings.

135.    The issues raised in "Progressive Farms, Inc.'s" state court action against DAS are identical to the issues adjudicated by this Court and the Fifth Circuit, they relate to an identical core of operative facts, and they are identical to the issues raised in these proceedings by Benny Judah d/b/a Progressive Farms.

136.    Progressive Farms, Inc. a/k/a Progressive Ag, Inc. and Clearwater Farms, Inc. a/k/a Clearwater Corporation have not dismissed their state court actions against DAS and, unless otherwise enjoined by this Court, they will continue to prosecute their state court actions.

### JoEvelyn Patterson, Donald Gruben, And Sheila Gruben

137.    Donald Gruben and JoEvelyn Patterson were defendants and counterclaimants before this Court.

138.    The demand letter sent by Growers' counsel stated that his firm represents "Ms. JoEvelyn Patterson and Mr. Donald Gruben."



139. DAS named Donald Gruben and JoEvelyn Patterson as defendants in reliance on Resisting Growers' counsel's representation.

140. Sheila Gruben, Donald Gruben, and JoEvelyn Patterson assert a common, jointly-held claim involving one farm, FSA Farm No. 3084.

141. Sheila is Donald's wife, and the two operate an entity called "Donald & Sheila Gruben Farms, Inc." Patterson is a landlord with some interest in the claim.

142. FSA-156 Report for Farm No. 3084 shows "Donald & Sheila Gruben Farms" as the "operator" and lists "JoEvelyn Patterson" as the "owner."

143. Sheila Gruben's interests and the interests of Donald Gruben and JoEvelyn Patterson in these proceedings and the subject matter of them, including the claims against DAS, are more than closely aligned, they are identical.

144. Donald Gruben and JoEvelyn Patterson counterclaimed against DAS in these proceedings.

145. There is an express or implied legal relationship between Donald Gruben and his wife Sheila, reinforced by their operation of "Donald & Sheila Gruben Farms," whereunder Donald was accountable to Sheila for the claims made against DAS.

146. Donald Gruben and JoEvelyn Patterson adequately represented Sheila Gruben's interests in these proceedings.

147. Donald Gruben served as Sheila Gruben's virtual representative in these proceedings, in the appeal to the Fifth Circuit, and he continues to serve as Sheila Gruben's virtual representative in the pending petition for *writ of certiorari* to the United States Supreme Court.



148.    Sheila Gruben has not offered any evidence that she did not previously and does not now consider Donald Gruben to be her virtual representative in these proceedings.

149.    Sheila Gruben has not offered any evidence that she was prejudiced or disadvantaged by Donald Gruben's virtual representation of her in these proceedings.

150.    Sheila Gruben suffered no prejudice or disadvantage as a consequence of Donald Gruben's virtual representation of her in these proceedings.

151.    Donald and Sheila Gruben, and JoEvelyn Patterson, sued DAS in Texas state court on or about January 23, 2002, in the District Court for the 39th Judicial District, Haskell County, Texas.

152.    The issues raised in Sheila Gruben's state court action are identical to the issues adjudicated by this Court and the Fifth Circuit and they relate to an identical core of operative facts.

153.    The claims made in Sheila Gruben's state court action are identical to the claims adjudicated by this Court and the Fifth Circuit, they relate to an identical core of operative facts, and they are identical to the counterclaims asserted by Donald Gruben and JoEvelyn Patterson in these proceedings.

154.    DAS' motion for injunctive relief against Sheila Gruben is not a collateral attack on this Court's Order dated June 25, 2002, denying DAS' motion to alter or amend the judgment to specifically denominate Sheila Gruben as a defendant because DAS did not request the Court to adjudicate and decide the question whether Sheila Gruben and Donald Gruben are in privity with each other or the question whether Donald Gruben was at that time, or in the subsequent and pending appellate proceedings, serving as Sheila Gruben's virtual representative.

21



155.    Sheila Gruben has not dismissed her state court action against DAS and, unless otherwise enjoined by this Court, she will continue to prosecute that action.

### G-5 Partnership And Arthur Galvan

156.    "Arthur Galvan, d/b/a G-5 Partnership," was the specific description DAS used to identify one of the defendants in this action.

157.    In moving for leave to file their First Amended Counterclaim, "Arthur Galvan, Individually, and d/b/a G-5 Partnership" identified themselves as "Defendants and Counter-Plaintiffs."

158.    An amended counterclaim was thereafter asserted on behalf of "Arthur Galvan d/b/a G-5 Partnership."

159.    The parties identified themselves to the Fifth Circuit as "Arthur Galvan, d/b/a G-5 Partnership."

160.    The parties have identified themselves to the United States Supreme Court in their pending petition for *writ of certiorari* as "Arthur Galvan, doing business as G-5 Partnership."

161.    Galvan did not previously argue to this Court or to the Fifth Circuit that he was sued and served in the wrong capacity or in an incorrect manner. Galvan does not argue to the United States Supreme Court that he was sued and served in the wrong capacity or in an incorrect manner.

162.    Having failed to seek an adjudication in this Court of the question whether he was sued and served in the wrong capacity or manner, and by failing to raise that issue in the Fifth Circuit, let alone before the United States Supreme Court, Galvan has waived any issues relating to the capacity and manner in which he was sued and served.

22



163.    G-5 Partnership is a Texas partnership formed under the Texas Uniform Partnership Act.

164.    Galvan is the managing partner of the G-5 Partnership.

165.    Service on Galvan was effective service on G-5 Partnership.

166.    G-5 Partnership and Arthur Galvan have the same business address, "P.O. Box 1003, Denver City, TX 79323.

167.    All Strongarm purchase invoices for both Galvan and G-5 Partnership are made to "Arthur Galvan, P.O. Box 1003, Denver City, TX 79323," and Growers' counsel submitted exactly the same alleged Strongarm invoices to support both the claims of G-5 Partnership and Arthur Galvan. Those invoices went to "Arthur Galvan, P.O. Box 1003, Denver City, TX 79323."

168.    Galvan signed the Grower Questionnaire on behalf of G-5 Partnership and the FSA 1007 sheets for a farm owned by G-5 Partnership.

169.    Because Galvan is the managing partner of G-5 Partnership, there is an express or implied legal relationship between them whereunder Galvan is accountable to G-5 Partnership for his conduct of and participation in these proceedings and the ongoing appellate proceedings in his matter.

170.    No partner or other agent of G-5 Partnership has offered evidence that Galvan was not authorized to bring the counterclaims that he did in these proceedings as "Arthur Galvan d/b/a G-5 Partnership."

171.    Arthur Galvan was authorized to, and did, prosecute G-5 Partnership's claims against DAS in these proceedings.

23



172. Neither Galvan nor any other partner or agent of G-5 Partnership has offered evidence that G-5 Partnership was prejudiced or disadvantaged by Galvan's virtual representation of G-5 Partnership in these proceedings.

173. G-5 Partnership suffered no prejudice or disadvantage as a consequence of Galvan's virtual representation of it.

174. Galvan and G-5 Partnership are in privity with each other.

175. Galvan and G-5 Partnership are estopped to deny that they are in privity with each other.

176. Regardless of the manner in which Galvan was sued or served, by moving the Court for leave to assert amended counterclaims against DAS on April 10, 2002, as "Arthur Galvan, Individually, and d/b/a G-5 Partnership," Galvan voluntarily submitted himself and G-5 Partnership to the jurisdiction of this Court.

177. As managing partner of G-5 Partnership, Galvan had authority to act on behalf of G-5 Partnership in these proceedings.

178. There is no evidence that any person other than Galvan makes the decisions for G-5 Partnership with respect to its business, financial and legal affairs.

179. Galvan is responsible for and makes the decisions for G-5 Partnership with respect to its business, financial and legal affairs.

180. This Court acquired personal jurisdiction over Galvan and over G-5 Partnership not later than April 10, 2002.

24



181. This Court acquired subject matter jurisdiction over any claims possessed by Galvan individually against DAS and over any claims possessed by G-5 Partnership not later than April 10, 2002.

182. At all times pertinent to these proceedings, the appeal to the Fifth Circuit and in the pending petition for writ of certiorari to the United States Supreme Court, Galvan has been serving as, and continues to serve as, G-5 Partnership's virtual representative with respect to G-5 Partnership's claims against DAS.

183. G-5 Partnership is estopped to deny its virtual representation by Arthur Galvan as described.

184. G-5 Partnership has acquiesced in and has thereby ratified Arthur Galvan's virtual representation of its interests in its claims against DAS as described.

185. G-5 Partnership and Arthur Galvan sued DAS in state court on January 22, 2002 in the District Court for the 121st Judicial District, Yoakum County, Texas.

186. The claims asserted by Arthur Galvan and by G-5 Partnership in the state court proceedings are identical to the counterclaims asserted by Arthur Galvan d/b/a G-5 Partnership in these proceedings, and they relate to an identical core of operative facts.

187. The issues raised in the state court proceedings filed by Arthur Galvan and by G-5 Partnership are identical to the issues adjudicated by this Court and the Fifth Circuit and they relate to an identical core of operative facts.

188. Galvan and G-5 Partnership have not dismissed their respective state court actions against DAS and, unless they are otherwise enjoined by this court, they will continue to prosecute them.



### Morris Rushing And Pea-Cot Farms, Inc.

189.　"Morris Rushing, d/b/a Pea-Cot Farms," was the specific description DAS used to identify one of the defendants in this action.

190.　In moving for leave to file their First Amended Counterclaim, "Morris Rushing, Individually, and d/b/a Pea-Cot Farms" identified themselves as "Defendants and Counter-Plaintiffs."

191.　Rushing is the President, manager and registered agent of Pea-Cot Farms, Inc.

192.　Rushing did not previously argue to this Court or to the Fifth Circuit that he was sued and served in the wrong capacity or in an incorrect manner. Rushing does not argue to the United States Supreme Court that he was sued and served in the wrong capacity or in an incorrect manner.

193.　Having failed to seek an adjudication in this Court of the question whether he was sued and served in the wrong capacity or manner, and by failing to raise that issue in the Fifth Circuit, let alone before the United States Supreme Court, Rushing has waived any issues relating to the capacity and manner in which he was sued and served.

194.　Resisting Growers' counsel sent DAS a combined damages demand for both Rushing and Pea-Cot Farms for $314,335 (242 acres).

195.　All Strongarm invoices were sent to "Morris Rushing, P.O. Box 537, Plains, TX 79335."

196.　FSA documents establish that Farm 1523 is owned 75% by Morris Rushing and 25% by Pea-Cot Farms, Inc.

197.　FSA documents establish that Farm 1654 is owned 75% by Morris Rushing and 25% by Pea-Cot Farms, Inc.

26



198.    Pea-Cot Farms, Inc. does not claim or offer evidence that Rushing's participation in these proceedings as described was undertaken contrary to the corporation's best interests or that Rushing's conduct was unauthorized or *ultra vires*.

199.    Pea-Cot Farms, Inc. does not claim or offer evidence that Rushing failed adequately to represent Pea-Cot Farms' interests in the prior proceedings, in the appeal to the Fifth Circuit, or that he is not now adequately representing Pea-Cot Farms, Inc.'s interests in the pending petition for *writ of certiorari* to the United States Supreme Court.

200.    As President, manager and registered agent of Pea-Cot Farms, Inc., there is an express or implied legal relationship between Rushing and Pea-Cot Farms, Inc. whereunder Rushing is accountable to Pea-Cot Farms, Inc. for his conduct of and participation in these proceedings.

201.    There is no evidence that any person other than Rushing makes the decisions for Pea-Cot Farms, Inc. with respect to its business, financial and legal affairs, or that any person but Rushing has those responsibilities.

202.    Rushing is responsible for and makes the decisions for Pea-Cot Farms, Inc. with respect to its business, financial and legal affairs.

203.    Pea-Cot Farms, Inc. has acquiesced in Rushing's participation in these proceedings as described and has thereby ratified Rushing's virtual representation of Pea-Cot Farms, Inc. in these and the continuing appellate proceedings herein.

204.    Pea-Cot Farms, Inc. is estopped to deny Rushing's virtual representation of it in these and the continuing appellate proceedings herein.

205.    The only available inference to be drawn is that Morris Rushing and Morris Rushing individually and d/b/a Pea-Cot Farms participated in these proceedings, the appeal to the Fifth

27



Circuit, and are participating now in the pending petition for *writ of certiorari* to the United States Supreme Court, as the virtual representatives of Pea-Cot Farms, Inc..

206. Rushing and Pea-Cot Farms, Inc. are in privity with each other.

207. Rushing and Pea-Cot Farms, Inc. are estopped to deny that they are in privity with each other.

208. Rushing and Pea-Cot Farms, Inc. are estopped to deny that Rushing has served, and is now serving, as Pea-Cot Farms, Inc.'s virtual representative in these and the continuing appellate proceedings herein.

209. Morris Rushing's and Morris Rushing, individually and d/b/a Pea-Cot Farms' interests and Pea-Cot Farms, Inc.'s interests in these proceedings and in the subject matter of them, including all claims against DAS, are more than closely aligned, they are identical.

210. Neither Rushing nor any officer or agent of Pea-Cot Farms, Inc. has offered evidence that Pea-Cot Farms, Inc. was prejudiced or disadvantaged by Rushing's virtual representation of Pea-Cot Farms, Inc.

211. Pea-Cot Farms, Inc. suffered no prejudice or disadvantage as a consequence of Rushing's virtual representation of it.

212. Morris Rushing and Morris Rushing, individually and d/b/a Pea-Cot Farms adequately represented Pea-Cot Farms, Inc.'s interests in these proceedings and there are no facts to suggest that Morris Rushing and/or Morris Rushing d/b/a Pea-Cot Farms are not now adequately representing Pea-Cot Farms, Inc.'s interest in the pending petition for *writ of certiorari* in the United States Supreme Court.

28



213. Pea-Cot Farms, Inc. has acquiesced in and thereby ratified Morris Rushing's virtual representation of it in these proceedings, in the appeal to the Fifth Circuit, and in the pending petition for writ of certiorari to the United States Supreme Court.

214. Morris Rushing and/or Morris Rushing d/b/a Pea-Cot Farms are now, and throughout the course of these proceedings they have been, the virtual representatives of Pea-Cot Farms, Inc.

215. Morris Rushing is now, and throughout the course of these proceedings has been, the virtual representative of Pea-Cot Farms, Inc.

216. Morris Rushing and Pea-Cot Farms, Inc. sued DAS in state court on January 22, 2002 in the District Court for the 121st Judicial District, Yoakum County, Texas.

217. Morris Rushing and Pea-Cot Farms, Inc. have not dismissed their state court actions against DAS and, unless otherwise enjoined by this Court, they will continue to prosecute their state court actions.

218. The state court actions by Morris Rushing and Pea-Cot Farms, Inc. assert identical claims to those previously asserted in these proceedings by Morris Rushing, Individually, and d/b/a Pea-Cot Farms, Inc. The issues raised in the state court proceedings are identical and they arise from and relate to an identical case of operative facts.

### Tommy Coleman And Sand Farms, Inc.

219. In its original "Complaint for Declaratory Relief" in this Court, DAS named "Tommy Coleman" as a defendant.

220. Coleman asserted in his Answer that he was not a proper party. Coleman did not, however, seek an adjudication of that issue. No effort was made to obtain Coleman's individual dismissal, and no effort was made to have Coleman dropped as a misjoined party.



221. Coleman did not seek dismissal because Sand Farms, Inc. was an indispensable but absent party.

222. In their motion for leave to file a First Amended Counterclaim in this case, the parties identified as defendants and counter-claimants included "Tommy Coleman, d/b/a Sand Farms, Inc."

223. Coleman included himself among the "Interested Parties" in the Growers' appeal to the Fifth Circuit.

224. Coleman has identified himself as among the petitioners for a *writ of certiorari* to the United States Supreme Court from the Fifth Circuit's decision.

225. Coleman did not argue to the Fifth Circuit that he was sued and served in the wrong capacity or in an incorrect manner. Coleman does not argue to the United States Supreme Court that he was sued and served in the wrong capacity or in an incorrect manner.

226. Having failed to seek an adjudication in this Court of the question whether he was sued and served in the wrong capacity or in an incorrect manner, and by failing to raise that issue in the Fifth Circuit, let alone before the United States Supreme Court, Coleman has waived any issues relating to the capacity or manner in which he was sued and served.

227. Neither this Court's entry of summary judgment in favor of DAS and against the counterclaimants, nor the Fifth Circuit's affirmance of same, imposed a money judgment against Coleman or otherwise imposed any affirmative obligation upon him.

228. Coleman disclaims having any personal or individual claim against DAS. The only claim to be reinstated that Coleman could have asserted to the Fifth Circuit, therefore, and the only claim he currently asserts to the United States Supreme Court, is the claim of Sand Farms, Inc.

30



229. Coleman is the President and a director of Sand Farms, Inc. and he is its registered agent.

230. The "Grower Questionnaire submitted with the demand letter on this claim shows that Coleman and Sand Farms, Inc. share a common address - "1800 Park Lane, Wellington, Texas." Coleman is listed as a person having an interest in the allegedly damaged peanut fields. Tommy Coleman signed the questionnaire on behalf of Sand Farms, Inc.

231. FSA-156 Report for Farm No. 1624 shows "Sand Farms, Inc." as the "operator" and lists "Tommy Coleman" as an "owner."

232. Coleman has disclaimed any personal or individual claim against DAS. Accordingly, his participation in these proceedings, the appeal to the Fifth Circuit, and his petition for a *writ of certiorari* to the United States Supreme Court can be explained only by his status as the virtual representative of Sand Farms, Inc

233. Sand Farms, Inc. does not claim or offer evidence that Coleman's participation in these proceedings as described was undertaken contrary to the corporation's best interests or that Coleman's conduct was unauthorized or *ultra vires*.

234. Sand Farms, Inc. does not claim or offer evidence that Coleman failed adequately to represent Sand Farms, Inc.'s interests in the prior proceedings, in the appeal to the Fifth Circuit, or that he is not now adequately representing Sand Farms, Inc.'s interests in the pending petition for *writ of certiorari* to the United States Supreme Court.

235. As the President, a director, and the registered agent of Sand Farms, Inc., there is an express or implied legal relationship between Coleman and Sand Farms, Inc. whereunder Coleman is accountable to Sand Farms, Inc. for his conduct of and participation in these proceedings.

31



236.    There is no evidence that any person other than Coleman makes the decisions for Sand Farms, Inc. with respect to its business, financial and legal affairs, or that any person but Coleman has those responsibilities.

237.    Coleman is responsible for and makes the decisions for Sand Farms, Inc. with respect to its business, financial and legal affairs.

238.    Sand Farms, Inc. has acquiesced in Coleman's participation in these proceedings as described and has thereby ratified Coleman's virtual representation of Sands Farms, Inc. in these and the continuing appellate proceedings herein.

239.    Sand Farms, Inc. is estopped to deny Coleman's virtual representation of it in these and the continuing appellate proceedings herein.

240.    The only available inference to be drawn is that Tommy Coleman and Tommy Coleman d/b/a Clearwater Farms participated in these proceedings, the appeal to the Fifth Circuit, and are participating now in the pending petition for *writ of certiorari* to the United States Supreme Court, as the virtual representatives of Sand Farms, Inc.

241.    Coleman and Sand Farms, Inc. are in privity with each other.

242.    Coleman and Sand Farms, Inc. are estopped to deny that they are in privity with each other.

243.    Coleman and Sand Farms, Inc. are estopped to deny that Coleman has served, and is now serving, as Sand Farms, Inc.'s virtual representative in these and the continuing appellate proceedings herein.

32



244. Tommy Coleman's and Tommy Coleman d/b/a Sand Farms, Inc.'s interests and Sand Farms, Inc.'s interests in these proceedings and in the subject matter of them are more than closely aligned, they are identical.

245. Neither Coleman nor any officer or agent of Sand Farms, Inc. has offered evidence that Sand Farms, Inc. was prejudiced or disadvantaged by Coleman's virtual representation of Sand Farms, Inc..

246. Sand Farms, Inc. suffered no prejudice or disadvantage as a consequence of Coleman's virtual representation of it.

247. Tommy Coleman and Tommy Coleman d/b/a Sand Farms, Inc. adequately represented Sand Farms, Inc.'s interests in these proceedings and there are no facts to suggest that Tommy Coleman is not now adequately representing Sand Farms, Inc.'s interests in the pending petition for *writ of certiorari* in the United States Supreme Court.

248. Tommy Coleman and/or Tommy Coleman d/b/a Sand Farms, Inc. are now, and throughout the course of these proceedings they have been, the virtual representatives of Sand Farms, Inc.

249. Tommy Coleman is now, and throughout the course of these proceedings has been, the virtual representative of Sand Farms, Inc.

250. DAS' motion for injunctive relief against Sand Farms, Inc. is not a collateral attack on this Court's Order dated June 25, 2002, denying DAS' motion to alter or amend the judgment to specifically denominate Sand Farms, Inc. as a defendant because DAS did not request the Court to adjudicate and decide the question whether Coleman and Sand Farms, Inc. are in privity with each

33

other or the question whether Coleman was at that time, or in the subsequent and pending appellate proceedings, serving as Sand Farm, Inc.'s virtual representative.

251.    Sand Farms, Inc. sued DAS in Texas state court on January 23, 2002 in the District Court for the 100th Judicial District, Collingsworth County, Texas.

252.    The issues raised in Sand Farms, Inc.'s state court action are identical to the issues adjudicated by this Court and the Fifth Circuit and they relate to an identical core of operative facts.

253.    The claims made in Sand Farms, Inc.'s state court action are identical to the claims adjudicated by this Court and the Fifth Circuit, they relate to an identical core of operative facts., and they are identical to the counterclaims that Tommy Coleman d/b/a Sand Farms, Inc. sought and obtained leave to assert in these proceedings.

254.    Sand Farms, Inc. has not dismissed its state court action and, unless otherwise enjoined by this Court, it will continue to prosecute its state court action.

### All of the Defendants, Counterclaimants and Resisting Growers Have Shared Common Counsel Throughout These Proceedings And The State Court Proceedings

255.    Throughout the course of these proceedings, including the original action before this Court, the appeal to the Fifth Circuit, the pending petition for *writ of certiorari* to the United States Supreme Court, the parallel proceedings in the state courts, and in these proceedings on DAS' motion for injunctive relief, all of the Growers, including those who resist DAS' motion, have been represented by a shared and mutual counsel, Phil Watkins of Phil Watkins, P.C.

### Equitable Considerations

256.    In the absence of injunctive relief, DAS will suffer irreparable harm through the costs and expenses, including attorneys' fees, in defending itself in the several state court actions.

34



257.    In the absence of injunctive relief, DAS will suffer irreparable harm because it will be denied the benefits of the judgments in its favor from this Court and the Fifth Circuit.

258.    In the absence of injunctive relief, DAS will suffer irreparable harm because of the uncertainty whether each of the several courts entertaining the state court actions will properly, timely, consistently, and correctly apply the doctrines of *res judicata* and collateral estoppel to the claims and issues pending before them.

259.    If injunctive relief is granted, the named defendants, the counterclaimants as they have identified themselves, including the Resisting Growers, will suffer no harm because their interests are protected by their participation in the pending petition for *writ of certiorari* to the United States Supreme Court, or by the participation of their privies and their virtual representatives.

260.    The risk of harm to DAS in the absence of the requested injunctive relief outweighs the risk of harm to the defendants, the counterclaimants as they have designated themselves, their privies and those they serve as virtual representatives, if the requested injunctive relief is granted.

261.    The important public policy of achieving judicial economy will be served by granting the requested injunctive relief because it is more efficient that the contested issues of privity, virtual representation, *res judicata* and collateral estoppel be decided by one court rather than several.

262.    The important public policies underlying the doctrines of *res judicata* and collateral estoppel, achieving finality and certainty following contentious litigation, will be served by granting the requested injunctive relief.

263.    The important public policies underlying federalism, including the avoidance of unnecessary friction between federal and state courts in the interpretation and application of the

35



decisions of this Court and the Fifth Circuit, would be served by granting the requested injunctive relief.

264.   To the extent any of the foregoing Findings of Fact should more properly be denominated as Conclusions of Law, they are hereby deemed to be such.

Based upon the above findings, the Court makes the following conclusions of law:

## CONCLUSIONS OF LAW

265.   DAS is entitled to an order and injunctive relief because the Defendants/Counter-claimants, those in privity with them, and those whose interests have been virtually represented in these proceedings are employing multiple, parallel state court lawsuits as a tactic to avoid the preclusive effect of this Court's June 3, 2002 Order and Judgment, as affirmed by a unanimous panel of the Fifth Circuit Court of Appeals (the "Judgment"). The requested injunctive relief is proper pursuant to the All Writs Act, 28 U.S.C. § 1651, the "Relitigation Exception" to the Anti-Injunction Act, 28 U.S.C. § 2283, FED. R. CIV. P. 65, and this Court's inherent powers.

### This Court Has Jurisdiction To Grant Injunctive Relief.

266.   The Supreme "Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977). Similarly, it is well-settled that a federal district court can exercise jurisdiction "over a second action in order 'to secure or preserve the fruits and advantages of a judgment or decree rendered' by that court in a prior action[.]" *Newby v. Enron Corp.*, 302 F.3d 295, 300 (5th Cir. 2002); *Royal Ins. Co. v. Am. v. Quinn-L Capital Corp.*, 960 F.2d 1286, 1292 (5th Cir. 1992).



267. "It is a given that the district court, with jurisdiction over [the original federal action], ha[s] subject matter jurisdiction to issue an injunction to preserve and protect its jurisdiction." *Newby*, 302 F.3d at 300-01. "Such jurisdiction is appropriate where the effect of an action filed in state court would effectively nullify the judgment of a prior federal action. This is true even where the federal district court would not have jurisdiction over the second action if it had been brought as an original suit." *Royal Ins.*, 960 F.2d at 1292 (citations and internal quotation marks omitted); *see Southwest Airlines Co. v. Tex. Int'l Airlines, Inc.*, 546 F.2d 84, 90 (5th Cir. 1977) (collecting authorities); *see also id.* ("Without this doctrine, judgments of federal courts would have little effect whenever later circumstances would preclude a party from reestablishing independent jurisdiction."); Wright, Miller & Cooper, FED. PRAC. & PROC., Juris. 2d § 4226.

### DAS Is Not Sufficiently Protected In The State Courts.

268. The Resisting Growers' only reason to continue prosecution of their parallel state court actions is to attempt to persuade the individual state courts that they are not obliged to accord *res judicata* and collateral estoppel effect to the Judgment. The Resisting Growers cannot argue that DAS would be sufficiently protected in the various state courts by refiling its now withdrawn motions for summary judgment based on *res judicata* and collateral estoppel. This is true because the Resisting Growers necessarily will be arguing just the opposite to those same state courts; *i.e.*, that the state courts should not accord preclusive effect to the Judgment in the parallel state proceedings. Indeed, the Resisting Growers have argued exactly that in their Gaines County action. There, the Resisting Growers have argued that the federal judgments in these proceedings are defective.



269.    This Court's and the Fifth Circuit's choice to apply uniform federal law to the FIFRA preemption issues is precisely the sort of choice-of-law determination that the relitigation exception to the Anti-Injunction Act protects from collateral attack in state courts. "[T]he district court's choice-of-law determination 'necessarily precludes the application of Texas law, so an injunction preventing relitigation of that issue in state court is within the scope of the relitigation exception to the Anti-Injunction Act.'" *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 680 (5th Cir. 2003) (quoting *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 150 (1988) (footnote and brackets omitted)).

270.    The Resisting Growers have intentionally stacked the deck against DAS by simultaneous pursuit of so many different parallel state court actions. The law cannot tolerate the risk that even one state court might carve out some exception to *res judicata* and collateral estoppel and allow the action before it to proceed. "A single positive trumps all the negatives. "Even if just one judge in ten [fails to find preclusion], then . . . the probability that at least one will [allow a state action to proceed] is 65% ($0.9^{10} = 0.349$)." *In re Bridgestone/Firestone, Inc.*, 333 F.3d 763, 766-767 (7th Cir. 2003) (Seventh Circuit enforced its prior de-certification of national class pursuant to relitigation exception to Anti-Injunction Act by remanding to District Court with instructions to enjoin members of putative classes and their attorneys from attempting certification of national classes in various state courts).

271.    Fifth Circuit law agrees that this Court cannot accept the risk that even a single state court might decline to accord preclusive effect to the Judgment. The Growers "may not relitigate the very issue[s] which lie[] at the core of [their] claim[s]. . . . In these circumstances, a federal court need not stand idly by and hope that the state court perceives that the issues before it formed the



basis of prior federal court litigation. Rather the federal court may intervene, pursuant to § 2283, 'to protect or effectuate its judgments.'" *Int'l Ass'n of Machinists & Aerospace Workers v. Nix*, 512 F.2d 125, 132 (5th Cir. 1975). The relitigation exception specifically "allows a party with a favorable federal judgment to protect that judgment by enjoining repetitive state court proceedings without having to rely on a plea of *res judicata* in the state court." *Carey v. Sub Sea Int'l, Inc.*, 121 F. Supp. 2d 1071, 1073 (E.D. Tex. 2000) (citations omitted), *aff'd*, 285 F.3d 347 (5th Cir. 2002).

### An Injunction Is Proper Pursuant To Both The All Writs Act And The Relitigation Exception To The Anti-Injunction Act.

272.    In *Vasquez*, "[t]he district court halted plaintiffs' 'judicial hopscotch' by invoking the All Writs Act, which authorizes federal courts 'to issue all writs necessary or appropriate in aid of their respective jurisdiction and agreeable to the usages and principles of law.'" 325 F.3d at 675 (quoting 28 U.S.C. § 1651). "This power dovetails with the relitigation exception to the Anti-Injunction Act, which, although generally prohibiting federal courts from enjoining state court proceedings, permits a court to enjoin a state court 'where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.'" *Id.* (quoting 28 U.S.C. § 2283). "The [All Writs] Act contains the same language as the second of the three exceptions in the Anti-Injunction Act, and the parallel 'necessary in aid of jurisdiction' language is construed similarly in both the All Writs Act and the Anti-Injunction Act." *Newby*, 302 F.3d at 301 (footnote omitted). "The relitigation exception [the third exception] was designed to permit the federal court to prevent state litigation of an issue that previously was presented to and decided by a federal court. It is founded in the well-recognized concepts of *res judicata* and collateral estoppel." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988).



273.    This case presents the precise set of facts anticipated by the *Chick Kam Choo* majority and forecast by Justice White's concurrence. The issue of federal preemption of Texas common law was fully litigated before and decided by this Court. This Court's preemption rulings were reviewed by, affirmed by, and expanded by the Fifth Circuit Court of Appeals. Thus, the relitigation exception of the Anti-Injunction Act is squarely applicable and injunctive relief precluding the Resisting Growers' prosecution of their state court suits is perfectly proper in every way.

274.    Moreover, significant public policy concerns favor the requested injunctive relief. The Fifth Circuit has long recognized that application of the relitigation exception in the proper case, and this is one of them, enhances important principles of federalism:

> A consistent theme of [the Fifth Circuit's] opinions is that federal courts may enjoin the relitigation of in state courts of issues that federal courts have fully and finally adjudicated. These cases recognize that the modern version of the Anti-Injunction Act, enacted as part of the Judicial Code of 1948, was expressly intended to codify the "relitigation doctrine" which had been eroded by judicial construction. Rather than doing violence to the principles of federalism, this exception, when applied in a proper case, enhances them.

*Nix*, 512 F.2d at 130 (citations and footnotes omitted).

275.    "[T]he relitigation exception prevents multiple litigation of the same cause of action and it assures the winner in a federal court that he will not be deprived of the fruits of his victory by a later contrary state court judgment which the Supreme Court may or may not decide to review." *Id.* at 130-31 (citations and internal quotation marks omitted); *see also Southwest Airlines Co.*, 546 F.2d at 91 (5th Cir. 1977) ("[T]he preliminary injunction would temporarily thwart the purpose of the assault [in state court] and thereby guarantee to [DAS] the fruits of its victory in [*Bates*].") "[A] district court [will] not err by invoking the relitigation exception, which seeks to prevent the wasteful and harassing revisiting of previously decided matters." *Vasquez*, 325 F.3d at 676.



### The Relitigation Exception Standards Are Met In This Case.

276.     Fifth Circuit courts "apply federal law to the question of the *res judicata* or collateral

estoppel effect of prior federal court proceedings, regardless of the basis of federal jurisdiction in

either the prior or the present action." *Jackson v. FIE Corp.*, 302 F.3d 515, 529 n.58 (5th Cir. 2002)

(citation and internal quotation marks omitted); *Agrilectric Power Partners, Ltd. v. Gen. Elec. Co.*,

20 F.3d 663, 664-65 (5th Cir. 1994).   This rule is especially important where, as here, a nationally

uniform policy enforcing a federal preemptive regime is at stake. *E.g., Semtek Int'l, Inc. v. Lockheed

Martin Corp.*, 531 U.S. 497, 509 (2001) ("[F]ederal reference to state [preclusion] law will not

obtain, of course, in situations in which the state law is incompatible with federal interests"); *see also

Nix*, 512 F.2d at 130 ("[N]othing would be as productive of friction between the state and the federal

courts as to permit a state court to interpret and perhaps to upset such a judgment of a federal court.")

(citation and internal quotation marks omitted).

> The test for the relitigation exception is the same test used to determine claim
> preclusion or *res judicata*: (1) the parties in a later action must be identical to (*or at
> least in privity with*) the parties in a prior action; (2) the judgment in the prior action
> must have been rendered by a court of competent jurisdiction; (3) the prior action
> must have concluded with a final judgment on the merits; and (4) the same claim or
> cause of action must be involved in both suits.

*Vasquez*, 325 F.3d at 675-76 (citation and internal quotation marks omitted, emphasis added).

277.     "Parties in privity count as identical parties for federal *res judicata* purposes."

*Bradley v. Armstrong Rubber Co.*, 120 F.3d 168, 179 (5th Cir. 1997) (footnote omitted).

278.     Moreover, the relitigation exception's incorporation of claim preclusion principles

extends its reach to claims that could have been asserted, but were not asserted, in the original

federal proceedings. *E.g., N.Y. Life Ins. Co. v. Deshotel*, 142 F.3d 873, 879-883 (5th Cir. 1998);

41



*Deus v. Allstate Ins. Co.*, 15 F.3d 506, 525 (5th Cir. 1994) ("Thus, any claims that [a party] did not

try to assert could have been enjoined.").

279.  The *Vasquez* Court further "recognized that the relitigation exception also applies

where issue preclusion, or collateral estoppel, exists." 325 F.3d at 676.

> Collateral estoppel exists where: (1) the issue at stake is identical to the one involved
> in the prior action; (2) the issue was actually litigated in the prior action; (3) the
> determination of the issue in the prior action was a necessary part of the judgment in
> that earlier action; and (4) the legal standard used to assess the issue is the same in
> both proceedings.

*Id.* at n.15 (citation and internal quotation marks omitted).  In the context of issue preclusion, "the

actual claims and the subject matter of each suit may differ," and the doctrine "may not always

require complete identity of the parties." *Next Level Comms. LP v. DSC Comms. Corp.*, 179 F.3d

244, 250 (5th Cir. 1999); *but see Vazquez*, 323 F.3d at 675-76 (claim preclusion does attach to those

"in privity with" actual parties.

280.  Both this Court and the Fifth Circuit already have considered, adjudicated, and

rejected the same arguments, claims, and contentions the Resisting Growers and their privies now

attempt to make in the Texas state courts.  Accordingly, the doctrines of *res judicata* and collateral

estoppel bar all of the claims asserted here and prevent the Growers and their privies from re-

litigating them in state courts.

### The State Court Plaintiffs Are Either Exactly The Same Ones Involved In This Case, Are In Privity With Parties Involved In This Case, Or Were Virtually Represented By The Parties Involved In This Case.

281.  There is no dispute that the following persons and entities are parties to both this

action and the remaining parallel state court actions: (1) Dennis Bates, (2) Jimmy Burson, (3)

Richard Cox, (4) Wayne Davis, (5) Neil Friessen, (6) Jake Froese, (7) Thomas Fuston, (8) Greg

42



Hughes, (9) JH Cattle Company, (10) Rudy Klassen, (11) Ronnie Love, (12) Kevin Mathis, (13) Brad Palmer, (14) Kirk Parrish, (15) K-L Farms, (16) Jerry Parrish, (17) Stacy Price, (18) Billy Shannon, (19) Craig West, (20) Frenchie Lee Wheeler, (21) Donald Gruben, (22) JoEvelyn Patterson, and (23) Morris Rushing. With respect to those 23 persons or entities, there is no factual dispute; they are one and the same for purposes of the *res judicata* and collateral estoppel analyses.

282. Resisting Growers' counsel nevertheless contends that the Judgment may not be enforced against 8 of the state court plaintiffs (Comanche Horizon Corporation, Clearwater Corporation, Progressive Ag, Inc., Arthur Galvan, Morris Rushing, G-5 Partnership, Sand Farms, Inc. and Sheila Gruben) because they were allegedly not part of the federal action from which the Judgment emanates.

283. Literal identity of the parties is not required as part of the *res judicata* and collateral estoppel analysis so long as the party against whom enforcement is sought was in privity with a party involved in the initial decision. Here, each person or entity that counsel for Resisting Growers claims is not subject to the Judgment either was, in fact, subject to it or was in unmistakable privity with a party to the federal action.

284. "The power conferred by the [All Writs] Act extends, under appropriate circumstances, to persons who, though not parties to the original action . . . , are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977) (citations omitted).

285. It is well-settled that "it is within the discretion of a district court to expand the scope of an otherwise valid injunction issued pursuant to the relitigation exception of the Anti-Injunction

43



Act to include those in privity with parties to the federal court action." *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 721 (5th Cir. 1990); *see also id.* ("[W]e . . . conclude that a district court may include privies of parties within the scope of its injunction.") (citations omitted).

286.　Privity is a flexible concept and "has been described as nothing more than a legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close to afford application of the principle of preclusion." *Vazquez*, 325 F.3d at 677 (citation and internal quotation marks omitted). "Federal courts have deemed several types of relationships 'sufficiently close' to justify preclusion. . . . [A] non-party who controlled the original suit will be bound by the resulting judgment. . . . [And] federal courts will bind a non-party whose interests were represented adequately by a party in the original suit." *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 95 (5th Cir. 1997) (citations and footnote omitted). "Examples of the 'control' necessary to preclude a non-party are: the president and sole shareholder controls his company[,]" *Benson & Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1174 (5th Cir. 1987) (citation omitted), and as between partners and their partnerships. *1448, Inc.*, 939 F.2d at 1290. Moreover, Texas law is clear that service upon and subsequent judgment against a partner binds the partnership of which he is a member. TEX. CIV. PRAC. & REM. § 17.022 ("Citation served on one member of a partnership authorizes a judgment against the partnership and the partner actually served."). Texas law also recognizes that stockholders of a corporation are in privity with the corporation for *res judicata* purposes. *E.g.*, *Paine v. Sealey*, 956 S.W.2d 803, 907 (Tex. App. - Houston [14th Dist.] 1997, no pet.); *W. Inn Corp. v. Heyl*, 452 S.W.2d 752, 760 (Tex. Civ. App. - Fort Worth 1970, writ ref'd n.r.e.); *see also Donzis v. Immudyne, Inc.*, No. 04-00-00685CV, 2001 Tex. App. LEXIS 5489, at *5 (Tex. App. - San Antonio Aug. 15, 2001, no pet.). Such "relationships



may ground a claim preclusion defense, regardless which party to the relationship was first sued." *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1288 (5th Cir. 1989) (citations omitted).

287. The Fifth Circuit emphasizes that "the word 'parties' does not refer to formal or paper parties, but to parties in interest, that is, that persons whose interests are properly *placed before the court* by someone with standing to represent them are bound by the matters determined in the proceedings." *Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979, 983 (5th Cir. 1990) (original emphasis, quoting *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 869 (5th Cir. 1984) (citation and internal quotation marks omitted)).

288. By voluntarily appearing on April 10, 2002, and successfully moving for leave to assert causes of action against DAS, and by urging the Fifth Circuit to reinstate their counterclaims in their self-identified capacities, the Resisting Growers took affirmative action to obtain relief from this Court and the Fifth Circuit, thereby submitting themselves to the authority of both Courts:

> [DAS] is right that a party may waive any jurisdictional objections if its conduct does not reflect a continuing objection to the power of the court to act over the defendant's person. [DAS] is also right that when a party seeks affirmative relief from the court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter.

*PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 160 F.3d 453, 460-61 (5th Cir. 2001) (footnotes and internal quotation marks omitted). [1]

289. Thus, the Fifth Circuit holds that when any party, named or unnamed, served or unserved, engages in "an affirmative act recognizing the court's jurisdiction," that party cannot thereafter contest the propriety of the court's exercise of judicial authority over that person and the

---

[1] The same is true under Texas law: "A party makes a general appearance where it invokes the judgment of the court on any question other than jurisdiction." *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1340 (5th Cir. 1996) (citations omitted).



subject matter of a dispute. *Maiz v. Verani*, 311 F.3d 334, 341 (5th Cir. 2002). If "the parties in question filed their own motions which specifically requested a ruling from the trial court" which "motion, if granted, provided them with a benefit," the court's exercise of authority is invited and the party, having sought to benefit from the court's exercise of authority, is deemed to have voluntarily submitted to that authority as exercised. *Id.*

290.    This Court granted Comanche Horizon's and the other Resisting Growers' motion for leave to assert amended counterclaims and, that benefit having been granted, Comanche Horizon and its fellow Resisting Growers who claim they were not properly named, became *de facto* intervenors and parties to these proceedings. *Id.*; *see also In re Beef Indus. Antitrust Litig.*, 589 F.2d 786, 789 (5th Cir. 1979) ("[W]e will assume that the district court implicitly authorized [Comanche Horizon and its fellows] to intervene."); *Minton v. St. Bernard Parish Sch. Bd.*, Civ. A. No. 85-1258 (E.D. La. July 13, 1987) ("My affording relief to a non-party is, for all practical purposes, the equivalent to authorizing intervention.").

291.    In other words "[b]y participating in the proceedings [Comanche Horizon, Arthur Galvan, Individually, and d/b/a G-5 Partnership, Morris Rushing, Individually, and d/b/a Pea-Cot Farms, and Tommy Coleman d/b/a Sand Farms, Inc., Benny Judah, Individually, and d/b/a Clearwater Farms, and d/b/a Progressive Farms] became a party to them, regardless of whether [they] ever [were] formally named as such." *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 870 (5th Cir. 1984) (citation omitted); *see also id.* at 869 ("[T]he word 'parties' does not refer to formal or paper parties, but to parties in interest, that is, that persons whose interests are properly placed before the court by someone with standing to represent them are bound by the matters determined in the proceeding.") (citation and internal quotation marks omitted).

46



292.   The Resisting Growers tacitly admit that these rules of law operated to subject them to this Court's authority.   This is proven by the manner in which they have responded to DAS' motion for injunctive relief.   If the Resisting Growers were sincere that they had not previously submitted themselves to the Court's authority, then they would have had no standing to respond as they have without *first* moving the Court for leave to intervene in accordance with FED. R. CIV. P. 24(a)(2) and/or 24(b)(2), following the procedures prescribed in FED. R. CIV. P. 24(c).   The fact that the Resisting Growers saw no need to observe the procedures mandated by Rule 24 is proof that they understand the consequences of their voluntary appearance on April 10, 2002, the consequences of their self-identification to the Fifth Circuit, the fact that they were in privity with the parties as named and/or served, and/or that those properly named and served parties served as their virtual representatives.

293.   Comanche Horizon, for instance, spontaneously and voluntarily appeared and successfully moved the Court for leave to assert claims in its own name against Dow AgroSciences. The fact that it did not then join in the other Growers' amended counterclaims as filed is irrelevant to the *res judicata* and collateral estoppel analysis.   *E.g.*, *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 525 (5th Cir. 1994) ("[A]ny claims that [a party] did not try to assert could have been enjoined.").

294.   Similarly, it is wholly irrelevant that the bankruptcy stay as to DAS' declaratory judgment claims against Comanche Horizon was not lifted until June 7, 2002.   The Bankruptcy Court obviously gave Comanche Horizon permission to pursue *its own* claims against DAS at some time prior to January, 2002.   Otherwise, Comanche Horizon could not have brought its parallel state court action in Gaines County as it did.   That being true, according preclusive effect to Comanche Horizon's voluntary appearance in these proceeding on April 10, 2002, its successful motion for



leave to assert claims in its own name against DAS in these proceedings, and its virtual representation by its President and sole shareholder, Floyd Stokes, before the Fifth Circuit and the United States Supreme Court, cannot offend any aspect of bankruptcy law.

295.    This conclusion holds true regardless of the manner in which DAS' declaratory judgment claims against Comanche Horizon might separately be treated.  Thus, the fact that this Court did not permit Comanche Horizon's joinder as an additional declaratory judgment *defendant* is immaterial to the preclusive effect that flows from Comanche Horizon's voluntary appearance as a party successfully moving for leave to assert its own claims against DAS and its President's virtual representation of its interests before the Fifth Circuit.

296.    Finally, Comanche Horizon and its bankruptcy trustee do not contest the fact that its President, Floyd Stokes, was its virtual representative before the Fifth Circuit is acting in that capacity before the United States Supreme Court, or the fact that Stokes and Comanche Horizon are in privity with one another.  If, as the Resisting Growers now argue, Floyd Stokes had no individual claims to be asserted, and given that this Court's decision imposed no money judgment or other burden upon him, the only possible explanation for his participation in the Growers' appeal was to serve as Comanche Horizon's virtual representative.

297.    Sheila Gruben's claims asserted in Haskell County are precluded as a matter of law because they are inextricably intertwined with and no different from the claims that her husband litigated and lost, and which are currently the subject of her husband's pending petition for *writ of certiorari* to the United States Supreme Court. *E.g.*, *Meador v. Oryx Energy Co.*, 87 F. Supp. 2d 658, 665 (E.D. Tex. 2000) (citing *Eubanks v. FDIC*, 977 F.2d 166, 170 (5th Cir. 1992)) ("In

48

*Eubanks*, a wife was held to be in privity with her husband, thus preventing her from filing claims that had already been asserted by her husband based on his interest in a partnership.").

### The Resisting Growers Waived Any And All Arguments Concerning The Propriety Of Jurisdiction Or Alleged Defects In Service As A Matter of Settled Law.

298.    Rule 12(h)(1) of the Federal Rules of Civil Procedure requires that objections to jurisdiction and/or service of process be raised in a party's first responsive pleading or by motion filed prior to the responsive pleading:

> (h) Waiver or Preservation of Certain Defenses.  (1) A defense of lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of service of process is waived (A) if omitted from a motion in the circumstances described in subdivision (g), or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.

FED. R. CIV. P. 12(h).

299.    "It is clear under this rule that defendants wishing to raise any of these four defenses must do so in their first defense move, be it a Rule 12 motion or a responsive pleading." *Glater v. Eli Lilly & Co.*, 712 F.2d 735, 738 (1st Cir. 1983); *accord Kersh v. Derozier*, 851 F.2d 1509, 1511-12 (5th Cir. 1988); *Golden v. Cox Furniture Mfg.*, 683 F.2d 115, 118 (5th Cir. 1982); *T & R Enters., Inc. v. Continental Grain Co.*, 613 F.2d 1272, 1277 (5th Cir. 1980).  If a party files a pre-answer motion and fails to assert the defense of insufficiency of service, he waives that defense.  *See United States v. 51 Pieces of Real Property*, 17 F.3d 1306, 1314 (10th Cir. 1994); *Pusey v. Dallas Corp.*, 938 F.2d 498, 501 (4th Cir. 1991); *Golden*, 683 F.2d at 118; *T & R Enters., Inc.*, 613 F.2d at 1277.

300.    Comanche Horizon's first pleading in this matter was its April 10, 2002 joinder in the Growers' motion for leave to assert amended counterclaims.  Comanche Horizon did not assert jurisdictional defenses and waived any possible service issues by its voluntary and spontaneous

appearance and joinder in the Growers' motion. "Therefore, when [Comanche Horizon] failed to raise its personal jurisdiction and service-of-process objections in its . . . motion [for leave to assert counterclaims], it waived any objections that it might have had to the court's exercise of personal jurisdiction." *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990) (citations omitted). The same is true as to Arthur Galvan and Morris Rushing as individuals, as to G-5 Partnership, and as to Sand Farms, Inc. as a corporation.

301.    In this regard, it is important to note that neither Floyd Stokes, Tommy Coleman, Morris Rushing nor Arthur Galvan argued to the Fifth Circuit or to the United States Supreme Court that they were sued and served in incorrect capacities. Instead, they rested on their self-identification as Defendants and Appellants urging reinstatement of their counterclaims and the arguments they make now have been forever lost to them.

### The Identity Of The Claims Asserted Conclusively Prove Virtual Representation And Privity.

302.    The Resisting Growers cannot and do not argue that the claims they assert in state court relate to different peanut crops than the peanut crops that were the subject of the counterclaims they unsuccessfully urged the Fifth Circuit to reinstate in their self-identified capacities. Regardless of the manner and capacities in which the Resisting Growers were sued and served, they asserted claims in their self-identified capacities to single stakes. "If there is only one claimant to a stake, then by definition there are not overlapping and adverse claims to it." *Airborne Freight Corp. v. United States*, 195 F.3d 238, 242 (5th Cir. 1999). They are, therefore, estopped to argue now that their state law claims are being brought in their correct capacities but the counterclaims they urged the Fifth Circuit to reinstate were being pursued in incorrect capacities. *E.g.*, FED. R. CIV. P. 17(a).



## SERVICE UPON ARTHUR GALVAN IS EFFECTIVE TO BIND G-5 PARTNERSHIP.

303. FED R. CIV. P. 4(e)(1) and (h)(1) deem service effective if accomplished as authorized by the law of the state in which the District Court is located. Texas law is clear that service upon and subsequent judgment against a partner binds the partnership of which he is a member. TEX. CIV. PRAC. & REM. CODE § 17.022 ("Citation served on one member of a partnership authorizes a judgment against the partnership and the partner actually served."). Accordingly, Dow AgroSciences' service upon "Arthur Galvan d/b/a G-5 Partnership" is effective to bind G-5 Partnership as a matter of law.

## INJUNCTIVE RELIEF IS NECESSARY AGAINST THE GROWERS THAT CONCEDE THEIR STATE COURT CLAIMS ARE BARRED BECAUSE THEY REFUSE TO DISMISS THEM.

304. In response to DAS' motion for injunctive relief, the Growers concede:

> 5. For the purposes of this Response, the properly named Defendants stipulate that the doctrines of *res judicata* and/or collateral estoppel bar the properly named individual Defendants from pursuing state court cause[s] of action against [Dow AgroSciences]. These named individuals will timely make application for a writ of certiorari to the United States Supreme Court.

Response, p. 2. At footnote 1, the Growers identify the "properly named individual defendants" as "Dennis Bates, Jimmy Burson, Richard Cox, Wayne Davis, Neil Friessen, Jake Froese, Thomas Fuston, Greg Hughes, Sandra and Karl Don Hughes, d/b/a JH Cattle Co., Rudy Klassen, Ronnie Love, Kevin Mathis, Brad Palmer, Kirk Parris, d/b/a K-L Farms, Jerry Parish, JoEvelyn Patterson, Donald Gruben, Stacey Price, Billy Shannon, Craig West, and Frenchie Lee Wheeler . . . ."

305. Despite these Growers' stipulation that their state court lawsuits are barred by *res judicata* and/or collateral estoppel, and that any relief to which they are entitled must come from the United States Supreme Court, they stubbornly refuse to dismiss their state court claims. For this



reason, injunctive relief against them is necessary and appropriate -- and those Growers cannot be heard to argue against that inescapable conclusion.

306. "The fact that a prior litigant attempted to assert the claim of others is a factor militating in favor of the existence of privity." *Meador v. Oryx Energy Co.*, 87 F. Supp. 2d 658, 666 (E.D. Tex. 2000) (citation omitted). This factor is reinforced where, as here, "[t]he [party] was represented by a lawyer [and] fully litigated [the] case before the district court and the court of appeals, both of which reached the same conclusion." *Id.* (citation omitted). "The fact that all [the Growers] shared the same attorneys only reinforces this point." *1488, Inc. v. Philsec Inv. Corp.*, 939 F.2d 1281, 1290 (5th Cir. 1991).

307. Furthermore, the Fifth Circuit has "repeatedly held that a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *1488, Inc.*, 939 F.2d at 1290 (citations and internal quotation marks omitted). "Virtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a judgment suit raising identical issues." *Pollard v. Cockrell*, 578 F.2d 1002, 1008 (5th Cir. 1978).

### The Texas State Court Actions Are Based Upon Exactly The Same Claims That Were Raised Or Could Have Been Raised In The Federal Action.

308. In their live pleadings in the parallel state court actions, the Resisting Growers allege causes of action for negligence, deceptive trade practice violations, breach of express and implied warranty, and design defect relating to their use of DAS' Strongarm herbicide on their peanut crops in the year 2000 growing season. They also allege causes of action for fraud, fraud in the inducement, estoppel, and waiver claims based upon alleged post-application "off label" representations. Those are exactly the same claims rejected by the Fifth Circuit. *See Bates*, 332 F.3d



at 328-333. Indeed, the Fifth Circuit's opinion confirms that FIFRA preempts each and every one of their Texas state law claims, including claims based upon product effectiveness, breach of express and implied warranty, fraud, violations of the Texas Deceptive Trade Practices Act ("DTPA"), defective product design, and negligence. *Id.*

309.    To determine whether two suits involve the same claim under the fourth element [the same claim or cause of action], [the Fifth Circuit] has adopted the transactional test of the Restatement (Second) of Judgments. § 24. Thus, the critical issue is whether the two actions under consideration are based on "the *same nucleus of operative facts*." *Southmark Corp. v. Coopers & Lybrand*, 163 F.3d 925, 934 (5th Cir. 1999) (original emphasis, citations omitted).

310.    All of the state law claims asserted by the Resisting Growers arise from the same nucleus of operative facts that were asserted by them, by their privies, and those who served as their virtual representatives.

### Traditional Application Of The Rules Of Law And Equity Heavily Favors Granting The Requested Injunctive Relief.

311.    The legal and equitable principles imposed by FED. R. CIV. P. 65 provide the structure against which the requested injunctive relief should be measured. A traditional application of such standards heavily favors granting the requested injunctive relief. The equitable factors to be weighed when considering injunctive relief are familiar and well-settled: (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that the applicant will suffer irreparable injury if the injunction is not granted, (3) the applicant's threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest. *Lake Charles Diesel, Inc. v. General Motors Corp.*, 318 F.3d 192, 195-96 (5th Cir.



2003). Because the second factor in the analysis, the threat of "irreparable injury if the injunction

is not granted," dominates the equitable calculus in this context, it is addressed first.

### DAS Would Suffer Irreparable Harm In The Absence Of Injunctive Relief.

312.    "[T]he cost of relitigating the choice-of-law or *res judicata* issue in state court would

irreparably injure [DAS]." *Quintero,* 914 F.2d at 720.  This is especially true because the Growers'

sole purpose in pursuing their state law actions is to evade the federal defense of FIFRA preemption.

"[L]oss of a federal . . . defense constitutes plain legal prejudice." *Id.* at 719; *see also id.* at 726

("[T]he expense of relitigation, the exposure to additional actions, and the loss of the federal [FIFRA

preemption] defense . . . constitutes plain legal prejudice; . . ."); *accord, Regions Bank of La. v.

Rivet,* 224 F.3d 483, 492 (5th Cir. 2000) (agreeing that party seeking to enjoin state court action

"would suffer irreparable injury if the [state court action] were allowed to proceed, . . ."), *cert.

denied,* 531 U.S. 1126 (2001).[2]

### The Threatened Injury To DAS Clearly Outweighs The Threatened Harm To The Growers.

313.    The Resisting Growers and their privies cannot argue that any harm to them is

threatened by the requested injunctive relief.  "[T]he deprivation of an opportunity to pursue the

same issues in a state forum does not constitute a legitimate harm requiring a balancing of equities."

*Canady v. Allstate Ins. Co.,* 282 F.3d 1005, 1020 (8th Cir. 2002) (citation omitted).

---

[2]  There is broad agreement that a party suffers irreparable harm when it is required to relitigate in
state court issues previously decided in federal court. *E.g., Canady v. Allstate Ins. Co.,* 282 F.3d
1005, 1020 (8th Cir. 2002); *see also In re SDSS, Inc.,* 97 F.3d 1030, 1041 (8th Cir. 1996); *Daewoo
Elecs. v. Western Auto Supply Co.,* 975 F.3d 474, 478 (8th Cir. 1992).



**Granting The Preliminary Injunction Would Serve The Public Interest.**

314. The same important public policies that support the application of *res judicata* generally prove that the public interest would be served by granting the requested injunctive relief. The Fifth Circuit has described these important public policies as follows:

> *[R]es judicata* is a principle of peace. Under its influence an end is put to controversies. Parties and their privies are made to abide definitive and final judgments and litigations are concluded. *Res judicata* rests on a rule of public policy designed to put an end to mere contentious litigations. Under that rule an issue once finally settled by the judgment of a court of competent jurisdiction, remains settled. Public policy dictates that there be an end of litigation; that those who have contested an issue shall be found by the result of the contest; and that matters once tried shall be considered forever settled as between the parties.

*Airborne Freight Corp.*, 195 F.3d at 241 n.8 (quoting *Bennett v. Comm'r*, 113 F.2d 837, 839 (5th Cir. 1940) (brackets omitted)).

315. The important public policy of judicial economy would also be served by granting the requested injunctive relief. The Fifth Circuit "agree[d] with th[is] district court that . . . the resolution of this dispute in a single federal forum furthers the interests of judicial economy." *Bates*, 332 F.3d at 328. The Fifth Circuit emphasized, "We find that resolving the farmers' claims in a single federal forum clearly furthers the interests of judicial economy." *Id.* at n.6; *see also Dow AgroSciences LLC v. Bates*, 2002 WL 1205143, at *5 (N.D. Tex. March 12, 2002) (holding, *inter alia*, that DAS "brought this suit in this Court to avoid a multiplicity of suits in various state courts throughout Texas. Multiple lawsuits in various courtrooms could result in differing and conflicting decisions as well as a waste of judicial time."); *Vasquez*, 325 F.3d at 676 ("[T]he relitigation exception . . . seeks to prevent the wasteful and harassing revisiting of previously decided matters.").

55



**DAS Will Prevail, And Has Prevailed, On The Merits.**

316.    DAS already has prevailed on the merits of the underlying dispute and it has demonstrated why it must prevail as a matter of law in these proceedings.  Thus, this component of the FED. R. CIV. P. 65 analysis is satisfied.

317.    To the extent any of the foregoing Conclusions of Law should more properly be denominated as Findings of Fact, they are hereby deemed to be such.

56

## ORDER GRANTING INJUNCTIVE RELIEF

The following named persons and/or entities are hereby ORDERED to dismiss their state court lawsuits against DAS: Dennis Bates, Jimmy Burson, Richard Cox, Wayne Davis, Neil Friessen, Jake Froese, Thomas Fuston, Greg Hughes, Sandra and Karl Don Hughes, d/b/a JH Cattle Co., Rudy Klassen, Ronnie Love, Kevin Mathis, Brad Palmer, Kirk Parrish, d/b/a K-L Farms, Jerry Parish, JoEvelyn Patterson, Donald Gruben, Stacey Price, Billy Shannon, Craig West, and Frenchie Lee Wheeler. Each of these enumerated persons and entities and all persons and/or entities in privity with them, are hereby permanently ENJOINED from filing any lawsuits, in state or federal court, against DAS on or relating to any claim with respect to the use of DAS' Strongarm herbicide on peanut crops during the year 2000 growing season.

Counsel for these enumerated persons and entities, Phil Watkins and the law firm of Phil Watkins, P.C., are hereby ORDERED to cause the dismissal of the state court lawsuits filed for or on behalf of the above-enumerated persons and/or entities. Phil Watkins and the law firm of Phil Watkins, P.C. are further ORDERED to provide to this Court not later than ten days from the date of this ORDER satisfactory proof that said dismissals have been accomplished.

Phil Watkins and the law firm of Phil Watkins, P.C., and any attorneys associated with or in privity with them, are further ENJOINED from filing, pursuing or prosecuting any action in law or in equity, in state or federal court, for or on behalf of the above-enumerated persons and/or entities, or for or on behalf of any person or entity related to or in privity with them, relating to any claim with respect to the use of DAS' Strongarm herbicide on peanut crops in Texas and New Mexico during the year 2000 growing season.



The following named persons and/or entities are hereby ORDERED to dismiss their state court lawsuits against DAS:  Comanche Horizon Corporation, Clearwater Corporation, Clearwater Farms, Inc., Progressive Ag, Inc., Progressive Farms, Inc., Morris Rushing, Pea-Cot Farms, Inc., Sand Farms, Inc., Arthur Galvan, G-5 Partnership and Sheila Gruben.  Each of these enumerated persons and entities, and all persons and/or entities in privity with them, are hereby permanently ENJOINED from filing any lawsuits, in state or federal court, against DAS on or relating to any claim with respect to the use of DAS' Strongarm herbicide on peanut crops during the year 2000 growing season.

Counsel for these enumerated persons and entities, Phil Watkins and the law firm of Phil Watkins, P.C., are hereby ORDERED to cause the dismissal of the state court lawsuits filed for or on behalf of the above-enumerated persons and/or entities.  Phil Watkins and the law firm of Phil Watkins, P.C. are further ORDERED to provide to this Court not later than ten days from the date of this ORDER satisfactory proof that said dismissals have been accomplished.

Phil Watkins and the law firm of Phil Watkins, P.C., and any attorneys associated with or in privity with them, are further ENJOINED from filing, pursuing or prosecuting any action in law or in equity in state, in state or federal court, for or on behalf of the above-enumerated persons and/or entities, or any person or entity related to or in privity with them, relating to any claim with respect to the use of DAS' Strongarm herbicide on peanut crops during the year 2000 growing season.

Dated this ___14___ day of October, 2003.

_____
SAM R. CUMMINGS
UNITED STATES DISTRICT JUDGE

58